UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EYLEM TOK,
    Petitioner,

        v.

BRIAN A. KYES, UNITED STATES
MARSHAL, DISTRICT OF
MASSACHUSETTS,
    Respondent.

Docket No. 25-cv-10649

## EYLEM TOK'S MEMORANDUM OF LAW IN SUPPORT OF HER PETITION FOR A WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241

Petitioner Eylem Tok ("Petitioner" or "Ms. Tok") is a Turkish citizen who was found extraditable to Türkiye pursuant to the decision entered by Magistrate Judge Donald L. Cabell on February 11, 2025. *See In re Extradition of Eylem Tok*, No. 24-MJ-01365-DLC, Docket No. 156 (D. Mass. February 11, 2025). Ms. Tok seeks habeas relief from this Court because her extradition would violate the Constitution and laws and treaties of the United States. *See* 28 U.S.C. § 2241(c)(3). The two allegations for which extradition is sought each fail to meet the requirements of the Treaty on Extradition and Mutual Assistance in Criminal Matters Between the United States of America and the Republic of Türkiye, U.S.-Turk., June 7, 1979, 32 U.S.T. 3111 (hereinafter, the "Treaty"), for one or more of the following reasons: Ms. Tok has not been charged with an offense under the meaning of the Treaty; Türkiye has failed to submit the arrest warrants required to support extradition; Ms. Tok cannot be deprived of liberty for more than one year for the alleged offenses; on the facts alleged, the requirement of dual criminality is not met because the alleged actions would not be a felony under relevant United States law, and the conduct on which the Magistrate Judge relied to find dual criminality is separate from the

1

conduct alleged to violate Turkish law; and/or the allegations on which the government relies would not violate Turkish law. Moreover, Ms. Tok was arrested and detained in violation of the Fourth Amendment and 18 U.S.C. § 3184. This Court should grant Ms. Tok's petition for habeas relief and order the immediate discharge of the conditions of release imposed on her.

Separately but relatedly, Ms. Tok, through counsel, is in the process of submitting a petition to the Secretary of State challenging her extradition to Türkiye on the grounds that she is more likely than not to face serious harm in violation of the United Nations Convention Against Torture and Other Cruel, Inhumane or Degrading Treatment or Punishment if returned to Türkiye. Ms. Tok and her family have received targeted death threats, and there have been protests near her former home advocating harm to her.[1] (D. 92-3.)[2] The Turkish government has done nothing to stop these threats or protests even though the threats have been reported to them. In addition, the Turkish government has stated that if Ms. Tok returns to Türkiye, she will be questioned by law enforcement and probably detained indefinitely.[3] Prisons in Türkiye are

---

[1] Two people who hold Ms. Tok's son responsible for the death of their relative in a car accident have stated publicly that they are going to come in person and confront her at the airport if she returns to Türkiye. Türkiye Today, *US to extradite Turkish author and son to Türkiye over deadly Istanbul hit-and-run* (February 11, 2025), *available at* https://www.turkiyetoday.com/turkiye/us-to-extradite-turkish-author-and-son-to-turkiye-over-deadly-istanbul-hit-and-run-118221/.

[2] Docket numbers in this petition refer to the docket of the underlying extradition proceeding, *In the Matter of the Extradition of Eylem Tok*, Docket No. 24-mj-01365-DLC (D. Mass).

[3] Ms. Tok has not yet been indicted. Türkiye permits lengthy detention of individuals post-indictment, as well as detention pre-indictment. United States Department of State, *Turkey (Türkiye) 2023 Human Rights Report* 10 (2023), *available at* https://www.state.gov/wp-content/uploads/2024/02/528267_TU%CC%88RKIYE-2023-HUMAN-RIGHTS-REPORT.pdf (last visited March 19, 2025) (noting the length of pretrial detention sometimes exceeded the maximum sentence, certain offenses may be detained post-indictment for five years, and "broad use of pretrial detention had become a form of summary punishment"). Ms. Tok has already been detained for nine months—longer than pre-indictment detention is permitted in Türkiye for most cases. *Id.* (Pre-indictment detention limited to six months for cases "that did not fall under the purview of the heavy criminal court" and one year for other cases). It is Ms. Tok's

overcrowded, and it is well-documented that prisoners are regularly held without adequate food, shelter, or medical care, and not protected from abuse and violence. The U.S. State Department has documented gross, flagrant, and mass violations of human rights in Türkiye as recently as 2023, and those conditions continue to the present. Further, Ms. Tok's work as a writer and artist has also been the subject of negative press because of her political views. Her second novel, published in 2014, was overtly political, focused on poverty and the rights of ethnic minorities, while criticizing the government, security forces, and the media.[4] Ms. Tok's publisher ultimately withdrew the book from publication.

The current petition does not include a humanitarian-based challenge because, under the procedure recently endorsed by the District Court in *Taylor v. McDermott*, 516 F. Supp. 3d 94 (D. Mass. 2021), a petitioner must file a § 2241 petition after an adverse executive branch decision to challenge the Secretary of State's rulings on humanitarian grounds. Should the Secretary of State rule against Ms. Tok while the current petition remains pending, Ms. Tok intends to seek amendment of her § 2241 petition, consistent with *Taylor v. McDermott*, 516 F. Supp. 3d 94, 112 (D. Mass. 2021), and *Trinidad y Garcia v. Thomas*, 683 F.3d 952, 957 (9th Cir.

---

understanding that the charges for which extradition is sought would not be in the jurisdiction of the more serious criminal court. *See* Republic of Türkiye Ministry of Justice, *Turkish Justice System* (August 28, 2020), *available at* https://taa.gov.tr/yuklenenler/dosyalar/0e03c8d1-c1be-4c7f-ada0-97ba13291f65-turk-yargi-sistemi-brosur-son-28.08.2020-eng2.pdf, at 20 (noting that assize courts handle charges punishable by more than 10 years or life in prison).

[4] The headline on a Turkish review at the time of the book's release was, "This book will make the Prime Minister[ ] very angry." *Bu kitap Başbakan'ı çok kızdıracak*, ODA TV, June 4, 2014, *available at* https://www.odatv.com/kultur-sanat/bu-kitap-basbakani-cok-kizdiracak-59698 (reviewed using Google translate). According to that review, the book "questions the system that brings best friends to the point of pulling guns on each other," and "contains many indirect criticisms of today's government," describing "individuals as pawns who are victims of the system," while emphasizing "the importance of remaining a free individual." One character, who is a supporter of the Prime Minister, names his three children Recep, Tayyip, and Erdoğan; that character's wife and these three children are all killed in an attack at the end of the book. After the book was published, Mr. Erdoğan became the President of Türkiye, and remains in that position to this day.

2012). This Court has the discretion to address the merits of the substantive issues raised in the current petition before the Secretary of State makes a decision on any humanitarian challenge by Ms. Tok.[5]

## II.    FACTUAL AND PROCEDURAL SUMMARY

Ms. Tok is a Turkish citizen who was certified as extraditable by Magistrate Judge Donald L. Cabell on February 11, 2025. The facts and allegations underlying this case and procedural history are laid out in detail in Ms. Tok's habeas petition with citations to the record. In summary:

On March 1, 2024, at around 11:20 p.m., a Porsche driven by Ms. Tok's son, T.C., was involved in an accident that injured five individuals who were stopped by the side of the road, one of whom later died. T.C. is a minor, and a U.S. citizen. At the scene, one of the injured parties handed his cellphone to Z.H.D., another minor, so Z.H.D. could use the flashlight feature on the phone to look at the injured party's head. Z.H.D. then absentmindedly pocketed the phone. When Z.H.D. returned to his housing complex, he handed the phone to another minor, K.A., who did not want to take responsibility for the phone, and left it on a wall. A security officer then took the phone.

After the collision, Ms. Tok, who was having dinner with her ex-husband's employee, received a call about the accident and went to pick up T.C. with the employee. They dropped off two other minors at the entrance to the same housing complex to which Z.H.D. had returned. Two witnesses state that Ms. Tok received the phone from the security guards, and relying on these statements, the Turkish government's extradition filings maintain that Ms. Tok then took

---

[5] If the court would consider humanitarian grounds now, Ms. Tok respectfully requests notice and leave to amend the petition and provide complete briefing on those issues.

the cellphone from the security guard.[6] The security guards all report, and the surveillance footage shows, that another woman took the phone; despite the video and testimonial evidence to the contrary, that woman simply denies ever having received the phone she is seen receiving on surveillance footage. Days later, T.C.'s driver found an iPhone beneath the rear right seat of his car with a low battery indicator, and delivered the phone to the Eyupsultan Public Order Bureau.

On the night of the accident, Ms. Tok and T.C. went to the airport and flew first to Cairo and then to the United States.[7] On March 6, 2024, a Turkish court issued a document described as an "arrest warrant," seeking to detain Ms. Tok to take her statement regarding a possible violation of Article 283 of the Turkish Criminal Code (protecting an offender). A second so-called "arrest warrant" was issued on March 13, 2024, seeking to take Ms. Tok's statement regarding a possible violation of Article 281 or the Turkish Criminal Code (destroying, concealing, or altering evidence).

The United States initially declined to move forward on the Article 281 charge, which the original extradition request related to the cellphone, and sought an arrest warrant based only on the Article 283 charge. Ms. Tok was arrested on June 14, 2024, and has remained in the custody of the U.S. Marshal for Massachusetts since that date. After Ms. Tok filed a motion to dismiss, the government filed an amended complaint, expanding the grounds on which it was seeking Ms.

---

[6] The Turkish government's summaries of evidence are often inaccurate and need to be checked against the witness statements provided by Türkiye. For instance, the government says in two separate summaries that Ms. Öcalgiray, D.O.O., and Ms. Saltoğlu reported that Ms. Tok took the phone from the security guards. (D. 11, 91; D. 73-4, 19.) Ms. Öcalgiray did not explain who took the phone; she only denied doing so herself. (*Id.* at 116.) D.O.O. does not report seeing any sort of hand-off, only hearing a conversation about the phone. (*Id.* at 110.) Ms. Saltoğlu says nothing on the subject. (D. 11, 100-03.) The Magistrate Judge repeats at least one of these errors, relying on Türkiye's inaccurate summary to claim that Ms. Saltoğlu stated that Tok took the phone from the security officials. (*See* D. 156, at 12, 42-43.)

[7] T.C. is also being held for extradition in a related matter that is pending habeas review. *See T.C. vs. Kyes*, Docket No. 24-cv-12458-ADB (D. Mass).

Tok's extradition to include the Article 281 offense, destroying, concealing, or altering evidence. The amended complaint included a supplemental memorandum with "additional information and clarifications regarding the offences imputed on Eylem Tok," that suggested additional possible bases for the assertion that Ms. Tok violated Article 281.[8] No additional evidence was submitted in support of the amended complaint; the Turkish government provided no new witness statements or other investigative documents. In certifying extraditability (and denying Ms. Tok's motions to dismiss and for bail), the Magistrate Judge relied exclusively on Ms. Tok's alleged actions related to the cellphone for the alleged Article 281 violation. (D. 156 at 40-45 & nn. 34-35).

## III.   ARGUMENT

### A.  Standard of Review for Habeas Relief

On review for habeas corpus, this court may address "whether the magistrate had jurisdiction, whether the offense charged is within the treaty, and whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty," as well as review to address "serious due process concerns" or "constitutional rights." *Hilton v. Kerry*, 754 F.3d 79, 86 (1st Cir. 2014) (internal quotations and citations omitted). *See In re Burt*, 737 F.2d 1477, 1484 (7th Cir.1984) ("federal courts undertaking habeas corpus review of extraditions have the authority to consider not only procedural defects in the extradition procedures that are of constitutional dimension, but also the substantive conduct of the United States in undertaking its decision to extradite if such conduct violates constitutional rights"). As

---

[8] Specifically, the government alleged Ms. Tok violated Article 281 by: (1) "[f]acilitat[ing] the removal of T.C. and two of his friends from the scene of the crash, thus preventing police from observing and questioning them immediately after the incident"; (2) removing T.C. from the scene, which prevented police from testing him for alcohol or drug use; and (3) taking a victim's phone from the security guards, claiming she knew the owner, and then leaving it in her driver's vehicle, where it was discovered days later. (D. 83, at 19.)

set forth below, extraditing Ms. Tok to Türkiye would be in violation of the Treaty, the Constitution, and the extradition statute and, therefore, is clearly reviewable by this Court.

### B. The Treaty Does Not Permit the Government to Extradite Ms. Tok When She Has Not Been Charged

Ms. Tok's detention and extradition are unlawful under the Treaty because she has not been charged. The Treaty authorizes extradition only of persons who (as relevant here) "are being prosecuted for or have been charged with an offense." Treaty, Chapter I, Section I, Article 1, paragraph 1. Although nearly a year has passed since Türkiye requested Ms. Tok's extradition, and more than a year has passed since the underlying events, Türkiye has never issued an indictment or formal charge and has never initiated a prosecution. (*E.g.*, D. 114, at 17 (government argument that indictment is unnecessary); *see* D. 144, at 8; D. 156 at 31-32.)[9] Neither prerequisite for extradition under the Treaty has been met. This extradition request is based on documents purporting to be arrest warrants that do not in fact seek Ms. Tok's arrest for prosecution.

The documents on which this extradition request is based refer to Ms. Tok as a "suspect," and state that the purpose of seeking her is to take her statement. D. 11, at 137 (prosecutor's office to be contacted "for taking her statement"), 140 ("statement shall be taken"). Both documents state that only *after* Ms. Tok is apprehended will authorities evaluate *whether* she will

---

[9] This is particularly troubling because, if returned to Türkiye, Ms. Tok will be subject to both pre-indictment and post-indictment detention despite having already been detained in the United States for more than the normally permitted pre-indictment detention period. United States Department of State, *Turkey (Türkiye) 2023 Human Rights Report*, *supra* n.3, at 10 (2023) (Pre-indictment detention limited to six months for cases "that did not fall under the purview of the heavy criminal court" and one year for other cases, and "broad use of pretrial detention had become a form of summary punishment"). The failure to indict Ms. Tok signals not only a lack of intent to actually prosecute her, but also a likely plan to hold her in custody without formal charges in a manner that would be both illegal and unconscionable in the United States. *See*, Sixth Amendment to the United States Constitution; 18 U.S.C. § 3161.

be arrested. (D. 11, at 137 ("arrest of the suspect for interrogation will be evaluated" after contacting prosecutor's office upon apprehension), 140 ("After her statement is taken, as it is evaluated whether she will be arrested…").) These documents cannot satisfy the Treaty's requirement that a person whose extradition is requested must be charged or in the process of being prosecuted; this investigatory stance does not even satisfy the broader accusatory definition of charged.

The plain language of the relevant provision, as well as other provisions of the Treaty, demonstrate that Ms. Tok is not subject to extradition. By its plain text, "charged" or "prosecuted" requires an ongoing criminal prosecution. *See* PROSECUTION, Black's Law Dictionary (12th ed. 2024) ("A criminal proceeding in which an accused person is tried"); Merriam-Webster. *Prosecute definition & meaning*. Merriam-Webster. https://www.merriamwebster.com/dictionary/prosecute ("to institute and carry on a legal suit or prosecution"); CHARGE, Black's Law Dictionary (12th ed. 2024) ("A formal accusation of an offense as a preliminary step to prosecution."); CHARGE, Black's Law Dictionary (12th ed. 2024) ("To accuse (a person) of an offense"). The plain text of the Treaty, therefore, establishes that a charge encompasses a formal accusation, and does not reach mere suspicion or investigation. *See Medellín v. Texas*, 552 U.S. 491, 506-07 (2008) ("The interpretation of a treaty, like the interpretation of a statute, begins with its text.").

Whether an individual has been properly charged under the Treaty is subject to habeas corpus review. *See Aguasvivas v. Pompeo*, 984 F.3d 1047, 1057-62 (1st Cir. 2021) (conducting habeas review of adequacy of charge). As the First Circuit concluded in *Aguasvivas*, where a treaty's plain text requires prosecution, an arrest warrant is insufficient to satisfy *not only* the separate requirement to produce a charging document, *but also* the preliminary requirement that

the person whose extradition is sought, is sought for an actual—not merely a "possible"—prosecution. *Id.* at 1058. The Fourth Circuit came to a similar conclusion in *Vitkus v. Blinken*, 79 F.4th 352 (4th Cir. 2023), in rejecting the government's argument that the court should defer to the Secretary of State's interpretation of a treaty. The treaty at issue in *Vitkus*—with Lithuania—is similar to the Treaty with Türkiye, in that both reference persons "charged" and/or "being prosecuted"/"sought for prosecution." *See id.* at 364. In *Vitkus*, the court concluded that an arrest warrant was insufficient to establish that the foreign national was either "'sought for prosecution'" or "'charged' with a crime" as required by the extradition treaty. *Id*. at 363. In so concluding, the court highlighted that the government's proposed construction of the treaty's requirements did "not follow from the clear [t]reaty language," and so it was an error of law to defer to the government's interpretation that a formal charge was not required. *Id*. at 362, 367 (quotation omitted).  The court further concluded that "The Notifications of Suspicion and Suspect Decisions relied on by the Secretary of State did not initiate criminal charges against Vitkus. They simply characterize him as a suspect, and thus do not satisfy the plain and unambiguous language of the Treaty's [charge] mandate." *Id.* at 364. That the treaty in *Vitkus* also required submission of "the charging document" does not alter this analysis: the court referred to "the charging document" as the documents that "perform the charging function" *Id*. at 363. The court, then, in making a determination of what satisfied a charging document requirement, was analyzing the meaning and function of the verb "to charge"—and concluded that mere identification of a suspect was insufficient.

Though certain courts have, in dicta, discussed the possibility of interpreting the word "charged" in treaties to not require formal charges, those courts have done so in the context of concluding that the determination of whether a petitioner was "charged 'under the terms of the

treaty'" was not reviewable on habeas corpus, a position that the First Circuit rejected in *Aguasvivas*. *See Aguasvivas*, 984 F.3d at 1057-62 (reviewing adequacy of charge); *cf. In re Assarsson*, 635 F.2d 1237, 1241-42 (7th Cir. 1980) (existence of formal charges not reviewable); *In re Assarsson*, 687 F.2d 1157, 1160 (8th Cir. 1982) (same); *Emami v. U.S. Dist. Ct. for N. Dist. of California*, 834 F.2d 1444, 1448 (9th Cir. 1987) (citing *Assarsson*, 635 F.2d at 1241). Even courts that have concluded that "charged with" treaty language does not require formal charges have found that only statements that a person either has been charged or is "wanted for prosecution" satisfy the treaty language. *Emami,* 834 F.2d at 1449 (German government's statement that person "is wanted for prosecution" satisfied "charged with" treaty language); *see Republic of France v. Moghadam*, 617 F. Supp. 777, 781 (N.D. Cal. 1985) (treaty language referring to persons "charged with" a crime was satisfied by arrest warrant and "a statement by the [foreign nation] that [the person sought] has been charged with violating [foreign] laws"). That simply is not the case here: Turkish documents repeatedly refer only to an intent to investigate. (*E.g.*, D. 11, at 137, 140 (referring to taking of statement with any next steps to be "evaluated"), D. 73-3, at 10 (requesting Ms. Tok be extradited "so that the investigation against her could be completed"); D. 73-4 at 25 (extradition necessary "for the Turkish judicial authorities to *evaluate* her legal status" as step prior to investigation and prosecution) (emphasis added).) Ms. Tok is not wanted for prosecution, and Türkiye has not—in the more than a year that has passed since this incident and the issuance of so-called arrest warrants—charged her.

Other provisions of the Treaty bolster the conclusion that the reference to charging an individual in Chapter I refers to an individual who has been formally charged, and not an individual sought for investigation and interrogation. The Treaty includes sections on both extradition processes (Chapter I) and mutual assistance in criminal matters (Chapter II). In

Chapter II, Section I, Article 21, the Treaty states that "Criminal matters for which mutual assistance shall be afforded include investigations," and that "mutual assistance shall include…effecting the taking of testimony or statements of a person." Nowhere in Chapter II, related to mutual assistance, does the Treaty mention arrest or extradition. Prior to the negotiation of the Treaty in 1979, Türkiye and the United States had an extradition treaty, but no mutual assistance provision treaty. *See* Treaty, Chapter III, Article 44 (prior extradition treaty shall cease to have effect); Jimmy Carter, United States-Turkey Treaty on Extradition and Mutual Assistance in Criminal Matters, Message to the Senate Transmitting the Treaty (August 2, 1979), https://www.presidency.ucsb.edu/documents/united-states-turkey-treaty-extradition-and-mutual-assistance-criminal-matters-message-the (extradition portion of new Treaty replaces current treaty, and mutual assistance portion of new treaty provides for "a broad range of cooperation in criminal matters"). The drafters of the Treaty clearly contemplated a procedure for assisting Türkiye in effecting the investigation and taking of Ms. Tok's statement, and that procedure was mutual assistance (Chapter II), not extradition (Chapter I).

Chapter II of the Treaty is not limited to seeking testimony only from persons who have not been accused; the provisions therein may be used to seek statements from any "persons," including statements "related to criminal matters." Treaty, Article 21. To conclude that any accused person whose statement is sought is "charged with an offense" under Chapter I would be to render the portions of Chapter II dedicated to mutual assistance for effecting the taking of statements surplusage and redundant. Notably, Chapter II of the Treaty contains procedures for both obtaining statements of an individual for a criminal matter and, "[i]f the Requesting Party considers the personal appearance of a witness… especially necessary," to secure the attendance of the individual to testify in person in the requesting country. *See* Treaty, Articles 25(3-4) and

31(1). Türkiye could and should have used these procedures to seek Ms. Tok's testimony (which is all that the so-called arrest warrants seek), either in the United States or in Türkiye. If it had done so, Ms. Tok would have been able to assert her rights against self-incrimination under the Fifth Amendment and/or the Turkish Constitution (Treaty, Article 25(4)), and could have refused to obey a summons to return to Türkiye in person without "any civil or criminal forfeiture, measure of restraint or legal sanction" unless she voluntarily went back to Türkiye (Treaty, Article 31(2)).

In interpreting the Treaty, this court should "avoid readings that render…language surplusage or redundant." *Yoo v. United States*, 43 F.4th 64, 71-72 (2d Cir. 2022), quoting *Sacirbey v. Guccione*, 589 F.3d 52, 66-70 (2d Cir. 2009). The court may also consider "as 'aids to its interpretation' the negotiation and drafting history of the treaty as well as 'the postratification understanding' of signatory nations." *Id*. quoting *Medellin v. Texas*, 552 U.S. 491, 507 (2008). The Treaty must be read as a whole, in light of the drafters' intent to provide a separate mechanism for mutual assistance that does not authorize extradition of persons, like Ms. Tok, who are sought for investigation.

Moreover, counsel is not aware of any courts interpreting the term "charge" broadly to mean "accused" based on extradition treaties that also include a section on mutual assistance, and no decision relied on by the Magistrate Judge analyzed a treaty that includes *both* extradition and mutual assistance.[10] Mutual assistance treaties (and their more "indirect" statutory

---

[10] *Manrique v. Kolc*, 65 F.4th 1037 (9th Cir. 2023) (United States-Peru Extradition Treaty, July 26, 2001, S. Treaty Doc. No. 107-6); *Vitkus v. Blinken*, 79 F.4th 352, 355 (4th Cir. 2023) (Extradition Treaty, Lithuania-United States, Oct. 23, 2001, S. Treaty Doc. No. 107-4); *Aguasvivas v. Pompeo*, 984 F.3d 1047 (1st Cir. 2021) (Dominican Republic-United States Extradition Treaty, Jan. 12, 2015, T.I.A.S. No. 16-1215); *Sacirbey v. Guccione*, 589 F.3d 52 (2d Cir. 2009) (Treaty between the United States and Servia for the mutual extradition of fugitives from justice, Signed at Belgrade, October 25, 1901, ratifications exchanged at Belgrade, May

counterpart, 28 U.S.C. § 1782) may be applied to collect evidence from or relating to someone who is broadly accused of criminal activity. *In re Premises Located at 840 140th Ave. NE, Bellevue, Wash.*, 634 F.3d 557, 564 (9th Cir. 2011) ("As their names suggest, these treaties provide for bilateral, mutual assistance in the gathering of legal evidence for use by the requesting state in criminal investigations and proceedings"); *e.g.*, *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 244 (2004) (court's discretion to grant foreign discovery requests applied to both foreign proceedings and investigations "conducted before formal accusation"). They do not, however, authorize extradition of persons who have not been charged with a crime; neither does the Treaty with Türkiye. *E.g.*, *In re Kasper-Ansermet*, 132 F.R.D. 622, 626 (D.N.J. 1990) ("the securing of testimony for a criminal investigation is a legitimate goal within the [Mutual Assistance] Treaty," but the treaty does not apply to "extradition or arrests of persons accused… of an offense").

By improperly using the extradition procedure to detain and seek statements from someone who has not been charged and is not being prosecuted, Türkiye is attempting to circumvent the plain language of the Treaty and the provisions in the Treaty that provide for mutual aid. This Court should deny Türkiye's attempt to seek the legal flexibility to subject Ms. Tok to lengthy pre-indictment and pre-trial detention and should conclude that the Treaty means

---

13,1902); *Emami v. U.S. Dist. Ct. for N. Dist. of California*, 834 F.2d 1444 (9th Cir. 1987) (Treaty of Extradition June 20, 1978, United States– Federal Republic of Germany, 32 U.S.T. 1485, T.I.A.S. No. 9785); *Matter of Assarsson*, 635 F.2d 1237 (7th Cir. 1980) (Convention on Extradition, Oct. 24, 1961, United States–Sweden, 14 U.S.T. 1845, T.I.A.S. No. 5496); *In re Extradition of Sarellano*, 142 F. Supp. 3d 1182 (W.D. Okla. 2015) (Extradition Treaty, Mex.-U.S., May 4, 1978, 31 U.S.T. 5059); *In re Extradition of Handanovic*, 829 F. Supp. 2d 979 (D. Or. 2011) (Treaty between the United States and Servia for the mutual extradition of fugitives from justice, Signed at Belgrade, October 25, 1901, ratifications exchanged at Belgrade, May 13,1902); *Republic of France v. Moghadam*, 617 F. Supp. 777, 781 (N.D. Cal. 1985) (Extradition treaty between France and the United States, signed at Paris, January 6, 1909).

what it says. In this context, "charged with an offense" must have a separate meaning, and that meaning must be its plain one: an actual charge. As such, Ms. Tok's detention is unlawful and her extradition would be too.

### C. Türkiye Has Not Submitted Arrest Warrants That Meet the Treaty's Requirements for Extradition

Article 7 of the Treaty requires that "a request relating to a person being prosecuted or who is charged with an offense, and who has yet to be convicted, shall be accompanied by…a warrant of arrest." Even assuming Ms. Tok has been charged or is being prosecuted for purposes of the Treaty, the separate requirement to submit a warrant of arrest has not been satisfied, and therefore her detention is unlawful and she is not extraditable.[11]

Both documents purporting to be arrest warrants state that only *after* Ms. Tok is apprehended will authorities evaluate *whether* she will be arrested. (D. 11, at 137 ("arrest of the suspect for interrogation will be evaluated" after contacting prosecutor's office upon apprehension), 140 ("After her statement is taken, as it is evaluated whether she will be arrested…").) The documents refer to Ms. Tok as a "suspect," and state that the purpose of seeking her is to take her statement. (D. 11, 137 (prosecutor's office to be contacted "for taking her statement"), 140 ("statement shall be taken").)

At least one court has concluded that documents similar to those provided here, which described an intention to "merely investigate" a person sought for extradition, and were "equivocal" on the question of whether a government is seeking prosecution, did not even satisfy the requirement of providing a valid arrest warrant. *Sacirbey v. Guccione*, 589 F.3d 52, 66-70 (2d

---

[11] The Magistrate Judge did not substantively address Ms. Tok's argument that the documents submitted are not, in fact, arrest warrants. (D. 153, at 5-7; D. 156 at 31-40.) Instead, the Magistrate Judge's decision appears to assume the documents were arrest warrants as required by the Treaty and evaluates Ms. Tok's argument regarding these documents only in the context of whether Ms. Tok had been "charged" under the Treaty language. (D. 156 at 31-40.)

Cir. 2009) ("While formal charges are not required to grant an extradition request, this letter corroborates that an investigation of Sacirbey *in the prosecutor's office*—rather than a prosecution in court—is pending in Bosnia. Based on our review of this evidence, we are dubious that Bosnia seeks to prosecute Sacirbey for a crime.") Notably, the court in *Sacirbey* interpreted the treaty language of "charged with crime" broadly: under that court's reading, an arrest warrant could have satisfied the treaty's language, but submitted statements referring only to an investigation *did not* satisfy the requirement. *Id.* Thus, even if this Court adopts a similarly broad reading of the term "charged" in the Treaty with Türkiye (which it should not, for the reasons set forth *supra* Part III.B), the documents submitted, which refer only to an investigation, are insufficient to fulfill the Treaty's requirements.

Not only do the purported arrest warrants not seek Ms. Tok's arrest, but the document alleging violations of Article 281 (the concealment charge) differs significantly from the Article 283 document. (D. 11, 137; D. 11, 140.) Unlike the Article 283 document, the Article 281 document does not instruct apprehending authorities to immediately *bring* the suspect to the prosecutor's office, but instead instructs authorities merely to *contact* the prosecutor's office with the suspect's statement. (D. 11, 137; D. 11, 140.) The Article 281 document also states plainly that authorities will evaluate whether the suspect will be arrested *at all* following her statement, not simply whether authorities will further evaluate arrest for interrogation purposes. (*Id.*) [12] Even were this Court were to find the Article 283 document sufficient to meet the Treaty

---

[12] The Article 281 purported arrest warrant entirely omits any cross-reference to the Turkish arrest statute. (D. 11, 140.) The Article 283 document includes two cross-references to the Turkish Code of Criminal Procedure: Article 248/5 and Article 100. Article 100 is titled, and describes, "Grounds for Arrest with a Warrant." (D. 11, 135-136.) Article 248/5 is titled, "Seizure in order to compel and certificate of guarantee," and states: "The justice of the Peace or the court may give a decision of arrest with a warrant *according to the provisions of Art. 100* and the following articles in the absence of the fugitive." (Emphasis added.) The decision issuing the

document requirements, the Article 281 document, which states plainly that only her statement— and not Ms. Tok herself—needs to be provided to the prosecutor's office, cannot be the basis for extradition. *See Aguasvivas*, 984 F.3d at 1062 (certification of extradition for charge not found in arrest warrant must be vacated); *Vitkus*, 79 F.4th at 361-65 (suspect letters insufficient to satisfy requirement that person sought be charged); *Sacirbey*, 589 F.3d at 66-67 (intention to investigate in connection with prosecutor's office does not equate to intention to prosecute). The reference to Ms. Tok as a "suspect" to be "apprehended" in the documents, upon which the Magistrate Judge relied to conclude Ms. Tok had been charged (D. 156, 39) does not transform the document into an arrest warrant, particularly where the document itself clearly differentiates arrest—a stage to be evaluated after her statement is taken—from apprehension. *See Vitkus*, 49 F.4th at 361 (differentiating Notifications of Suspicion and Suspect Decisions from separately issued arrest warrants). This document is not an arrest warrant and seeks only information that would be properly effected through the mutual aid provisions of the Treaty, not extradition.

Notably, in other published decisions involving the relevant Treaty with Türkiye, the extradition requests were not based on an arrest document at all, let alone a purported arrest document seeking only further investigation. Instead, they rested on a court decision—described as "like an Indictment"—or an actual judgment of conviction indicating that the Turkish government itself distinguishes a prosecution from an investigation. *See In re Extradition of Atuar*, 300 F. Supp. 2d 418, 422 (S.D. W. Va. 2003) (finding that a "March 20, 1992, Decision

---

Article 281 document refers only to Article 248/5, the seizure to compel provision, and makes no reference to Article 100, the arrest provision. *See* Turkish Criminal Procedure Code, available at https://sherloc.unodc.org/cld/uploads/res/document/tur/2005/turkish_criminal_procedure_code_h tml/2014_Criminal_Procedure_Code.pdf. The fact that the Article 281 document omits any reference to the formal authority to arrest Ms. Tok only underscores what the text of the document says—there has been no judicial decision to arrest Ms. Tok for an alleged violation of Article 281.

of the State Security Court of the Republic of Turkey charging [relator] with selling and purchasing heroin in violation of Articles 403/5, 6, and 7 of the Turkish Criminal Code and stating in detail the factual basis for the charges" "is a charging document somewhat like an Indictment which justifies the issuance of an arrest warrant in the United States"); *Matter of Extradition of Sidali*, 899 F. Supp. 1342, 1347 (D.N.J. 1995) ("the Court finds that the judgment of the Turkish Court, when considered in light of Turkish law, constitutes a final judgment or 'conviction'"). Here, by contrast, the Turkish government merely seeks to take Ms. Tok's statements as part of an investigation. The documents submitted do not satisfy the arrest warrant requirement of Article 7, and Ms. Tok cannot be extradited based on them.

**D.  Ms. Tok's Arrest Violated the Fourth Amendment and 18 U.S.C. § 3184 and Her Prolonged Detention Pursuant to an Unlawful Arrest Violates Her Due Process Rights**

Ms. Tok was detained in violation of the Fourth Amendment and 18. U.S.C. § 3184, and her continued detention violates her Fifth Amendment Due Process rights. The Warrant Clause states, "[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation…." U.S. Const. amend. IV. "The clarity of this language allows for no exceptions, regardless whether the government's purpose in making the arrest is to enforce treaties or our own domestic laws." *See Parretti v. United States*, 122 F.3d 758, 771 (9th Cir. 1997), *withdrawn under the fugitive disentitlement doctrine*, 143 F.3d 508 (9th Cir. 1998). The statutory authority for such arrest warrant provides that it may be issued based on a charge for "any of the crimes provided for by [the relevant extradition] treaty" if the evidence is deemed "sufficient to sustain the charge *under the provisions of the proper treaty.*" 18 U.S.C. § 3184 (emphasis added).

Ms. Tok was arrested based on a representation that she was extraditable for a violation of Turkish Criminal Code Article 283 and an arrest warrant was issued based on that complaint.

(D. 5, at 1-2 n.2 & 6; D. 6, at 1 n.2.)  The underlying information provided by the Turkish government, however, on which the arrest warrant relied, omitted critical information, namely that Ms. Tok was not in fact punishable under Article 283,[13] meaning that the Article 283 offense was one under which Ms. Tok could not be extradited. *See* Treaty, Chapter I, Section I, Article 2, paragraph 1(a) (extraditable offenses are those "punishable under both the federal law or the United States and the laws of Turkey *by deprivation of liberty at least for a period exceeding one year or by a more severe penalty*) (emphasis added); Treaty, Chapter I, Section II, Article 7 (requiring that requesting nation provide "the law prescribing the punishment for the offense, and the law relating to the limitation of legal proceedings or the enforcement of the penalty for the offense"); *see also infra* Part III.E (discussing penalty provision of Article 283 charge). As such, her initial arrest was unsupported by the required showing of probable cause to conclude that Ms. Tok had committed an extraditable crime. *See Parretti*, 122 F.3d at 767 (examining "whether the warrant for [the relator's] arrest was based upon competent evidence that [s]he committed an extraditable crime"); 776 ("the warrant for [the relator's] arrest was issued in violation of the Fourth Amendment because the government failed to make the necessary evidentiary showing of probable cause to believe that [the relator] had committed an extraditable offense"). That the government later amended its complaint against Ms. Tok to provide more information to include a second charge under Article 281, and that the Magistrate Judge ultimately found probable cause to extradite Ms. Tok on that charge, does not change the fact that her arrest and subsequent detention was unsupported by probable cause and therefore a violation of her Fourth Amendment rights. *See id.* (reversing order denying habeas corpus based on Fourth Amendment violation).[14]

---

[13] Despite Treaty requirements, Türkiye included only the first part of Article 283 in its original submission. (D. 11, at 87; *see* D. 37, at 4 n.3 (conceding the original omission).)

[14] *Parretti* involved a treaty that provided for provisional arrest based only on a foreign

Nothing precludes a requesting party from submitting serial extradition requests regarding the same allegations, because the principle of double jeopardy does not apply to successive extradition proceedings. *See, e.g.*, *Collins v. Loisel*, 262 U.S. 426, 429 (1923). But holding Ms. Tok for what is currently more than nine months pursuant to an unlawful arrest warrant violates not only her Fourth Amendment rights, but her Fifth Amendment rights to due process of law. *E.g.*, *Foucha v. Louisiana,* 504 U.S. 71, 80 (1992) ("[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."). This Court should therefore grant Ms. Tok's petition and order her immediate release.

### E.  The Treaty Does Not Permit Extradition Because Ms. Tok Cannot Be Punished By Greater Than One Year Imprisonment On Either Charge

Ms. Tok's detention and extradition are unlawful because neither of the alleged offenses is extraditable as charged. Article 2(1) of the Treaty provides that extraditable offenses must be punishable by deprivation of liberty for "at least a period exceeding one year or by a more severe penalty." The Treaty specifically requires that an extradition request contain all statutory information concerning limitations on punishment. It must include "[t]he text of the applicable laws of the Requesting Party, including the law defining the offense, the law prescribing the punishment for the offense, *and the law relating to the limitation of legal proceedings of the enforcement of the penalty for the offense*." Chapter I, Section II, Article 7, paragraph (1)(e) (emphasis added). Ms. Tok is not punishable in excess of one year for either of the two offenses alleged.

---

arrest warrant; the Government argued that a later probable cause determination based upon competent evidence would remove any Fourth Amendment issue. The Ninth Circuit rejected this view.

Turkish law is clear that Ms. Tok, as T.C.'s mother, cannot be punished at all for a violation of Article 283. Article 283(3) unambiguously states that the direct ancestor or descendant of an alleged offender cannot be punished under Turkish law for Protecting an Offender. The Turkish document issued for Ms. Tok for Article 283 identifies her as T.C.'s mother. (*See* D. 11, at 135 (identifying T.C. as Ms. Tok's son).) In addition, the evidence submitted with the extradition requests includes the official Extract of Vital Record that, in a Turkish court, would conclusively prove that Ms. Tok is T.C.'s mother. (*See* D. 73-3 at 57 (stating that custody of T.C. was given to "his mother," Ms. Tok).)

The Magistrate Judge bypassed this point because he concluded that the Article 281 charge was punishable by over a year in prison, and Article 2(4) of the Treaty permits extradition on multiple charges if one of them satisfies the minimum penalty requirement. (D. 156, at 19 (Court "bypasses without deciding the issue of whether the article 283 offense also does or does not satisfy the punishment requirement where Ms. Tok is T.C.'s mother").)[15] However, as explained at length in Ms. Tok's prior submissions, if Ms. Tok were brought to Türkiye and tried for Protecting an Offender, she could not under any circumstances be punished by imprisonment for *any* term, let alone imprisonment for more than a year. (*See* D. 143, at 12-17 (explaining why the Article 283 offense does not meet the Treaty requirements).) Because extraditability was certified only based on the Magistrate Judge's conclusion that the Article 281 charge satisfied the Treaty, if this Court concludes that the Article 281 charge was not a proper basis for extradition,

---

[15] The Magistrate Judge noted that Ms. Tok could be *prosecuted* under Article 283 notwithstanding any personal exemption as T.C.'s mother. (D. 156, at 19 n.17.) The possibility of prosecution for an offense is irrelevant where the Treaty requires that an offense be punishable by more than one year imprisonment. The only possible outcomes for Ms. Tok in a prosecution under Article 283 are acquittal or a decision not to impose a penalty due to personal exemption from punishment. (*See* D. 73-4, at 23-24.)

the Certification and Committal for Extradition (D. 171) must be vacated and Ms. Tok must be discharged.

In addition, as alleged, the Article 281 concealment offense can be punished only by up to one year, not "a period exceeding one year." In evaluating whether an offense is covered by the treaty, a court must consider all of the facts alleged and the laws applicable to the offense, including sentencing adjustments. *See United States v. Houmane*, 898 F. Supp. 2d 153, 169-70 (D.D.C. 2012) (applying Turkish statutory sentencing enhancement to assess applicability of minimum penalty provision); *Joseph v. Hoover*, 254 F. Supp. 2d 595, 599-600 (D.V.I. 2003) (although charged offense was punishable only by one year under British Virgin Islands law, defendant's criminal history as a "rogue and a vagabond" permitted sentence enhancement); *In re Yordanov*, No. CV 16-170-CAS(E), 2017 WL 216693, at *12 (C.D. Cal. Jan. 18, 2017) (applying sentencing enhancement to California law that would otherwise have had a maximum penalty of one year). The Treaty's provision that extradition for enforcement of an established sentence is only permissible if at least 6 months are left to be served also demonstrates the parties' concern with whether a significant penalty is both available *and* enforceable against the specific individual. *See* Treaty, Art. 2(2).

An intentional violation of Article 281 is punishable by "imprisonment for a term of six months to five years." Article 281(1). (D. 11, at 87.) However, "[w]here a person submits evidence of an offence, which had been concealed by him, before judgment is passed regarding such offence, the penalty to be imposed according to this Article *shall* be reduced by four-fifths." Article 281(3). (*Id.* (emphasis added).) The Turkish government alleges that Ms. Tok concealed a cellphone belonging to one of the accident victims by taking it from security guards and leaving it in a vehicle driven by T.C.'s driver, and that the driver then located the cellphone and

handed it over to police. (D. 73-4, 20.) The Turkish supplemental memorandum alleges that T.C.'s driver was Ms. Tok's agent in turning the cellphone over to the police: "Their drivers are the people, who work under them and carry out their orders and instructions; *there is no difference between something being in the possession of TOK and being in the possession of someone working under her*." (*Id.* (emphasis added).) The Magistrate Judge concluded that the driver's agency was disputed because the Turkish government also stated: "The difference between being in possession of TOK and being in possession of one of her subordinates will only emerge as a result of the trial." (D. 73-4, p. 20). This statement, however, does not dispute the driver's agency—he is, after all, still referred to as Ms. Tok's "subordinate." The statement only raises the question of whether Ms. Tok, at any point, physically possessed the phone. The Turkish official response as a whole states clearly that the driver was Ms. Tok's agent. After describing the driver's return of the phone to the police, the Turkish government states: "As a matter of fact, when the incident is evaluated as a whole, TOK acted together with *her subordinates* in general, and the behaviors of *her driver* and assistants made it easier for her to act." (D. 73-4, at 20) (emphasis added). This is a conclusive statement, from the Turkish government, that the driver was Ms. Tok's agent.

Because the government alleges that Ms. Tok's agent turned the cellphone over to police days after the accident and before any judgment was passed against Ms. Tok or T.C., the statutory penalty *must* be reduced by four-fifths, and Ms. Tok is punishable, if at all, by 4.8 months to a year. As such, she is not eligible for extradition under Article 281. And because Article 2(4) of the Treaty only applies if Ms. Tok is extraditable under Article 281, extradition on the Article 283 charge necessarily fails if the Article 281 charge does not permit extradition.

22

Therefore, the certification of extraditability should be vacated and Ms. Tok should be discharged.

### F.  The Article 281 Charge Does Not Satisfy the Dual Criminality Requirements of the Treaty

Ms. Tok's detention and extradition are unlawful because there is no dual criminality for the alleged Article 281 offense. The Treaty's definition of an extraditable offense incorporates the principle of dual criminality, requiring that an offender be punishable by more than a year's imprisonment for the alleged conduct if the offense were committed in either the requesting or requested country. "The principle of dual criminality dictates that, as a general rule, an extraditable offense must be a serious crime (rather than a mere peccadillo) punishable under the criminal laws of both the surrendering and the requesting state." *United States v. Saccoccia*, 58 F.3d 754, 766 (1st Cir. 1995). The crimes need not be identical, but the Court must examine the law and the evidence to determine whether "the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 316 (1922). The government alleged that the dual criminality requirement is met by "18 U.S.C. § 1512(b)(3), 18 U.S.C. § 1512(c)(2), M.G.L. c. 268, § 13B, and M.G.L. c. 268, § 13E." (D. 83, at 16; *see also* D. 83-1.)

The Treaty creates two categories of potentially extraditable offenses: one, of crimes listed in the Appendix to the Treaty, for which the analysis of dual criminality refers generally to "the laws of the Requesting Party and the Requested Party" (Article 2, Section 1(b)), and the other, of crimes not listed in the Appendix, for which the American offense must specifically be "under… the federal law of the United States" (Article 2, Section 1(a)). If an offense is listed in the Appendix, then the Court may look to federal or state law. *See In re Extradition of Manzi*, 888 F.2d 204, 207-08 (1st Cir. 1989) (treaty referring generally to "the laws of both Contracting Parties"). However, if the offense is not listed in the Appendix, then the Treaty unambiguously

specifies that only federal law applies. Because Article 281 (concealing or destroying evidence) is not listed in the Appendix to the Treaty, only 18 U.S.C. § 1512(b)(3) and 18 U.S.C. § 1512(c)(2) would need to be considered.[16] The Magistrate Judge relied exclusively upon 18 U.S.C. § 1512(b)(3).

### 1. The Magistrate Judge's Decision Was Erroneous Because The Conduct Alleged to Violate Article 281 Is Different Than The Conduct Alleged to Violate 18 U.S.C. § 1512(b)(3)

The Turkish statute at issue punishes "[any] person who destroys, erases, alters, conceals, or damages evidence of an offence in order to prevent the emergence of the truth." (D. 73-3 at 3, quoting Article 281(1).) There is no evidence presented by the Turkish government that Ms. Tok destroyed, erased, altered, or damaged any evidence related to an offense. The sole conduct asserted by Türkiye to constitute Ms. Tok's violation of Article 281 pertaining to the phone is that she allegedly "took possession of the cell phone belonging to the victim I.G. with the belief that it might contain evidence of the accident and with the intention of concealing the evidence" and then left it in the car of T.C.'s driver. (D. 73-4 at 21.) Anything that Ms. Tok may have said or done with regard to security guards would not establish the concealment of evidence that was not in her possession at the time of her contact with the security personnel.

But Ms. Tok's alleged statements to security guards are precisely what the Magistrate Judge determined would have violated 18 U.S.C. § 1512(b)(3). The Magistrate Judge found that Ms. Tok was alleged to have "misleadingly stated to the security officers that she knew the owner of the cellphone…." (D. 156 at 29.) The Magistrate Judge more specifically determined that Ms. Tok's conduct would have violated federal law because "she misled the security

---

[16] Given that the Magistrate Judge did not certify extradition based on state law, this Court should not consider whether dual criminality can be established by reference to the Massachusetts statutes on which the government relied. As noted in Ms. Tok's prior briefing, those provisions do not suffice to establish dual criminality. (D. 143 at 24-27.)

guards." (D. 156 at 30 n.24.) Section 1512(b)(3) punishes one who "knowingly… engages in misleading conduct toward another person, with intent to… hinder, delay, or prevent the communication to a law enforcement officer… of information relating to the commission or possible commission of a Federal offense." Notably, courts have required that "misleading conduct" under this provision relate to "the substance of [a witness's] testimony." *See United States v. Kulczyk*, 931 F.2d 542, 548 (9th Cir. 1991); *United States v. King*, 762 F.2d 232, 237 (2nd Cir. 1985). Therefore, the allegation that Ms. Tok misled the security guards about the owner of the phone would not violate Section 1512(b)(3) because it related to a fact about an object, not to what the security guards would have told police themselves.[17] But even if this alleged misleading conduct would have been sufficient to satisfy Section 1512(b)(3), it is different from the conduct that is alleged to have violated Article 281.

Section 1512(b)(3) does not address concealing evidence, and taking and concealing an evidentiary object would not violate that statute. If an analogous situation occurred in the United States, any offense based on misleading conduct would be complete before the security guards handed over the phone. On the other hand, Article 281 does not address misleading conduct or statements, so lying to the guards would not violate Article 281. The Article 281 offense would not have occurred until the phone was taken and concealed. There is no overlap, factually or temporally, in the alleged offenses. Because the dual criminality inquiry must focus on whether "*the particular act* charged is criminal in both jurisdictions," *Collins*, 259 U.S. at 316 (emphasis added), it is insufficient if one alleged act would violate Turkish law and a different alleged act

---

[17] Any connection between these alleged statements and the availability of the phone is attenuated by the fact that the security guards told police that they gave the phone to a different woman, not Ms. Tok. (D. 143-1, at 19-23.)

would violate federal law. Therefore, the Magistrate Judge's finding of dual criminality is legally erroneous.

>    **2.    While Not Before This Court Given that the Magistrate Certified Extradition Based on Section 1512(b)(3), Ms. Tok's Actions Also Would Not Have Violated 18 U.S.C. § 1512(c)(2)**

The only other federal statute cited by the government in support of extradition also would not apply to Ms. Tok's alleged conduct. The Magistrate Judge did not rely on this provision in certifying extradition, and as such, this Court need not and should not consider dual criminality under this provision. But it is worth emphasizing that this provision likewise would not meet the standard for dual criminality. Section 1512(c)(2) imposes criminal liability on anyone who "obstructs, influences, or impedes any official proceeding," but the Supreme Court recently construed it narrowly in light of its purpose and placement as part of the Sarbanes-Oxley Act (SOX). The Court concluded that, "[t]o prove a violation of Section 1512(c)(2), the Government must establish that the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or… other things used in the proceeding…." *Fischer v. United States*, 144 S. Ct. 2176, 2190 (2024). In *Fischer*, the Court emphasized that Section 1512(c) was enacted to ensure that those who destroyed corporate documents or other evidence could be held liable for misconduct like that involved in the Enron scandal. *See id.* at 2186. Therefore, Section 1512(c)(2) is limited, notwithstanding its seemingly broad language, to obstruction similar to that type of destruction of evidence. *See Fischer*, 144 S. Ct. at 2183-86. Creating false evidence (as opposed to altering or destroying existing evidence) would be the sort of conduct that would violate Section 1512(c)(2). *Id.* at 2186.

The government's theory based on Ms. Tok's alleged concealment of the cellphone[18] does not match up with the statute's requirements as explained in *Fischer*. Although there are vague allusions to the possibility of altering the contents of the phone in the Turkish government submissions, there is *no* evidence at all that Ms. Tok actually did so or would have had any ability to access a third-party's iPhone. Furthermore, the Turkish government has contended that T.C.'s driver was her employee and "there is no difference between being in the possession of MS. TOK and being in the possession of someone working under her," and the driver provided the phone to police. (D. 73-4 at 20.) Under the government's own theory, Ms. Tok did not impair the availability of the phone to police, but instead ensured that they got it. *See supra* Part III.E. The conduct alleged to violate Article 281 would not violate 18 U.S.C. § 1512(c)(2), so dual criminality is also not established under this theory.

### G. Ms. Tok's Alleged Actions Would Not Violate Article 281 Because The Phone Is Not "Evidence" Under Turkish Law

The object of an Article 281 violation is the destruction, alteration, or concealment of "evidence." Under Turkish law, Ms. Tok's actions do not violate Article 281 because the cellphone is not evidentiary.

First, the Turkish government does not claim that the cellphone is in fact evidentiary, but only that it *may* contain evidence. (*See, e.g.*, D. 11, at 92; *see also* D. 73-4, at 16 ("this phone, which *could* be in the nature of evidence") (emphasis added); *id.* at 19 ("*may* contain

---

[18] At certain points, the government has alleged that Ms. Tok violated Article 281 by removing T.C. and two of his friends from the scene of the accident. These allegations were not addressed by the Magistrate Judge, and would not violate federal law even if true and even if they stated violations of Turkish law. (*See* D. 143-2 at 6 (witnesses are not considered evidence that can be concealed under Turkish law).) Section 1512(c)(2), as part of SOX, does not address movement or concealment of a person. *See Yates v. United States*, 574 U.S. 528, 532 (2015) (plurality opinion) (a fish is not a "tangible object" in the context of SOX); *id.* at 549-50 (Alito, J., concurring in the judgment) (agreeing that "tangible object" under SOX "should refer to something similar to records or documents").

photographs and videos of the accident scene") (emphasis added); *id.* at 20 ("which *could* be in the nature of evidence") (emphasis added).) The individual to whom the phone belonged said nothing to suggest that his phone would contain evidence related to the accident; he simply noted that it was "lost at the scene." (D. 11, at 92 (identifying owner of phone); D. 143-1, at 11 (police statement by phone owner).)

In fact, the Turkish government declares directly that it has *not* concluded that the phone is evidentiary: "the examination of whether there is any determination regarding the occurrence of the accident or whether there is any messaging regarding the suspect's fault status on the cell phone is ongoing." (D. 73-4, 21.)[19] That the phone is not evidentiary is confirmed by its absence from the list of record evidence in T.C.'s criminal matter in Türkiye. (D. 143-4, Affidavit of Dilan Şabanoğlu Çakmak.)[20] Notably, more than a year after the alleged offense, Türkiye has made no effort to confirm that the cellphone is in fact evidentiary. If the phone is not in fact evidentiary, its concealment cannot violate Article 281 by the plain language of the statute, which only penalizes concealing "*evidence* of an offence in order to prevent the emergence of the truth" (emphasis added).

That conclusion is bolstered by the affidavit of Dr. Aras Türay, a law professor at Özyeğin University Faculty of Law, Department of Criminal and Criminal Procedure Law. (D. 143-2, Affidavit of Dr. Aras Türay.) The Federal Rules of Civil Procedure provide this Court

---

[19] The Magistrate Judge reaches the opposite conclusion based on a single clause in the Turkish government's description of Ms. Tok and T.C.'s departure: "From the moment the accident occurred, Eylem Ms. Tok tried to escape with her son T.C. abroad quickly. In this process, she prevented the police or people from finding the cell phone, which we consider as evidence, until the moment of escape." (D. 156, 24 (citing D. 73-4).) That one passing comment is inconsistent with the numerous conditional and equivocal statements by the Turkish government cited above, with the lack of any identification of actual phone contents relevant to T.C.'s case, and with its absence from the list of record evidence in T.C.'s case in Türkiye.

[20] The Magistrate Judge ignored this affidavit entirely. (*See* D. 156, at 23-35.)

with broad latitude in reviewing foreign law: "In determining foreign law, the court may consider any relevant material or source, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. Extradition courts rely on expert affidavits regarding foreign law. *See, e.g., Sidali v. I.N.S.*, 107 F.3d 191, 197-99 (3d Cir. 1997) (considering materials submitted by the parties to "decide issues of Turkish criminal law and procedure," and applying Fed. R. Civ. P. 44.1 which allows a court to consider materials from any source to decide questions of foreign law); *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1369-70 (S.D. Fla. 1999) (relying on expert affidavit to find lack of dual criminality under Bolivian law); *In re Lukes*, No. 2:02-MC-23-FTM, 2003 WL 23892681, at *2-3 & n.3 (M.D. Fla. May 8, 2003) (relying in part on "statements from Czech legal experts" to determine government had not alleged extraditable offense). After all, a judge in an extradition proceeding "is [not] expected to wield a rubber stamp" and it is proper to consider certain questions of foreign law "[b]ecause the Treaty itself requires an examination" of those questions. *See Skaftouros v. United States*, 667 F.3d 144, 158-59, 161 (2d Cir. 2011).[21]

Dr. Türay explains that under Turkish law, "Destruction, concealment or alteration of a thing that does not constitute evidence shall not constitute an offence." (*See* D. 143-2, at 6.) "[I]f

---

[21] The Magistrate judge excluded Dr. Türay's opinion as "contradictory evidence" because "although the opinion does not mention the cellphone, it implicitly pertains to the cellphone," "conveys that the cellphone…is not evidence," and "is only relevant if interpreted to mean that the cellphone does not have a function in proving the article 281 offense." (D. 156 at 23-24 & n. 22.) This reasoning does not square with the precedent that the court may consider "any relevant material or source" to determine foreign law, including foreign experts. Fed. R. Civ. P. 44.1; *e.g., Sidali*, 107 F.3d at 197-99. The Magistrate Judge reads in a contradiction that is not included in Dr. Türay's opinion, which simply provides an explanation of Turkish law without applying it to the cellphone. Dr. Türay's opinion does not contradict any explanation of Turkish law by the Turkish government. That logical reasoning from his explanatory opinion would support a conclusion the cellphone is not evidence does not make the opinion itself contradictory; it makes it precisely the type of relevant explanatory evidence courts may rely on. *E.g.*, *Sidali*, 107 F.3d at 197-99. In any event, this Court may consider Dr. Türay's opinion to inform its understanding of relevant Turkish law.

an object does not have any function in proving the offence or the person who committed the offence, it will be concluded that it does not have the status of evidence, and this object will not be subject to the offence under Article 281." (D. 143-2, at 6.)[22]

While the Government and Türkiye have articulated a range of other potential factual bases for the Article 281 offense, the Magistrate Judge did *not* certify Ms. Tok's extradition on these other bases.[23] (D. 156, at 40 n.34 (noting that these other means could potentially "provide[] a basis to certify Ms. Tok's extradition to the Secretary of State on the article 281 offense *if* the five elements set out in the legal standard have been satisfied" without concluding that any other allegations in fact satisfied the legal standard for extradition); *see also id.* at 43 n. 35 ("it is not necessary to address Ms. Tok's probable cause arguments" for grounds not relied upon for extradition).) Because the Magistrate Judge relied exclusively on the cellphone concealment allegations to certify extraditability, Ms. Tok's detention for the purposes of extradition cannot be justified based on allegations that were not the basis for the Magistrate Judge's decision to certify extraditability.

---

[22] The Magistrate Judge's conclusions with respect to foreign law are not factual findings. The Federal Rules explain that a court's determination on an issue of foreign law "must be treated as a ruling on a question of law." Fed. R. Civ. P. 44.1; *see also id.* Notes ("the court's determination of an issue of foreign law is to be treated as a ruling on a question of 'law,' not 'fact,' so that appellate review will not be narrowly confined by the 'clearly erroneous' standard of Rule 52(a)."

[23] The decision not to rely on those other allegations make sense given that when the purported warrant for the Article 281 charge was issued, the only allegations of concealment were that Ms. Tok concealed the cell phone, D. 11, at 90; allegations that she violated Article 281 by moving people were expounded on months later in a Turkish memorandum created after Ms. Tok filed a motion to dismiss. *E.g.*, D. 73-4, at 18, 21. Counsel is not aware of any case supporting the notion that the government may seek extradition after an arrest warrant was issued for additional alleged criminal conduct on which the warrant was not based.

## V.    PRAYER FOR RELIEF

For the foregoing reasons, Ms. Tok respectfully requests that the Court issue an order

granting her Petition, revoking the Certification and Committal for Extradition (D. 171), and

directing the immediate and permanent discharge of the conditions of release imposed on her in

connection with the extradition case, and such other and further relief as the Court deems just

and equitable.


Respectfully submitted,
EYLEM TOK,
By her attorneys,

/s/ Emma Quinn-Judge
Emma Quinn-Judge (BBO #664798)
David A. Russcol (BBO #670768)
Jennifer M. Herrmann (BBO # 708231)
Zalkind Duncan & Bernstein LLP
65a Atlantic Avenue
Boston, MA 02110
(617) 742-6020
equinn-judge@zalkindlaw.com
drusscol@zalkindlaw.com
jherrmann@zalkindlaw.com

Dated: March 19, 2025


### CERTIFICATE OF SERVICE

I, Emma Quinn-Judge, hereby certify that this document will be sent electronically to the
registered participants as identified on the Notice of Electronic Filing (NEF). A courtesy copy of
this memorandum will be emailed to Kristen Kearney, who has represented that she will be
entering an appearance for the government.

/s/ Emma Quinn-Judge
Emma Quinn-Judge