UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

EYLEM TOK,                              )
     Petitioner,                       )
                                       )
    v.                                  )    No. 1:25-CV-00371-MRD-PAS
                                       )
MICHAEL NESSINGER, WARDEN,              )
     Respondent.                       )

**<u>GOVERNMENT'S OPPOSITION TO EYLEM TOK'S AMENDED PETITION FOR
HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241</u>**

The Republic of Türkiye ("Türkiye") seeks the extradition of Eylem Tok pursuant to the
Treaty on Extradition and Mutual Assistance in Criminal Matters Between the United States of
America and the Republic of Turkey, U.S.-Turk., June 7, 1979, 32 U.S.T. 3111 (the "Treaty"), so
that she may be prosecuted on the charges of Destroying, Concealing or Altering Evidence, in
violation of Article 281 of the Criminal Code of Türkiye, and Protecting an Offender, in violation
of Article 283 of the Criminal Code of Türkiye. Tok is accused of assisting her then 16-year-old
son, "T.C.," to flee Türkiye immediately after he caused a fatal car crash. T.C., who is also sought
for extradition to Türkiye, allegedly killed one person and injured four others when he drove his
vehicle at an excessively high rate of speed around a corner late at night on March 1, 2024. Within
hours of the crash, Tok and T.C. had purchased airline tickets and fled Türkiye for the United
States, via Cairo, Egypt.

On February 11, 2025, Chief U.S. Magistrate Judge Donald L. Cabell in the District of
Massachusetts issued a 50-page Order denying Tok's motions to dismiss and for release from
custody and certifying her extradition to the Secretary of State. Tok now seeks habeas relief under
28 U.S.C. § 2241, requesting that the Court vacate the certificate of extraditability and order her

release from custody. Tok first filed a Petition for Habeas Corpus in the District of Massachusetts on March 19, 2025. Upon the government filing a motion to dismiss or transfer from the District of Massachusetts, dated March 31, 2025, Judge Burroughs ordered that the petition be transferred to this district because Tok is detained at a facility in Rhode Island.

## BACKGROUND

### I.    Legal Background

"In the United States, the procedures for extradition are governed by statute." *United States v. Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997). These statutes, 18 U.S.C. §§ 3181 *et seq.*, establish "a two-step procedure which divides responsibility for extradition between a judicial officer and the Secretary of State." *Id.* (footnote omitted). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *Id.*

Under 18 U.S.C. § 3184, the judicial officer serving as the extradition court—here, the Magistrate Judge—"upon complaint, issues an arrest warrant for an individual sought for extradition" and then conducts a hearing to determine if "the evidence [is] sufficient to sustain the charge under the provisions of the proper treaty." Specifically, the extradition court determines whether (1) it is authorized to conduct the extradition, (2) it has jurisdiction over the fugitive, (3) the applicable treaty is in full force and effect, (4) the treaty covers the offenses for which extradition is sought, and (5) there is probable cause to believe the fugitive committed the alleged offenses. *See* 18 U.S.C. § 3184; *Zanazanian v. United States*, 729 F.2d 624, 626 (9th Cir. 1984). If the Court finds that the requirements for certification are satisfied, it shall provide the

certification to the Secretary of State, together with a copy of any testimony taken before the Court, and it shall order the fugitive detained to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184; *see also Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 828-29 (11th Cir. 1993). The Secretary will then decide whether to surrender the fugitive to the requesting country. 18 U.S.C. §§ 3184, 3186; *Escobedo v. United States*, 623 F.2d 1098, 1105 (5th Cir. 1980) ("The ultimate decision to extradite is a matter within the exclusive prerogative of the Executive in the exercise of its powers to conduct its foreign affairs.").

A fugitive cannot directly appeal a certification order, but she may seek limited review by filing a petition for writ of habeas corpus. *See, e.g.*, *Kin-Hong*, 110 F.3d at 107-108 & n.3; *Koskotas v. Roche*, 931 F.2d 169, 171 (1st Cir. 1991).

## II.    Factual Background[1]

According to Turkish authorities, on the night of March 1, 2024, T.C. was driving Tok's Porsche with three passengers, one in the front, A.K., and two in the back, A.A. and B.A. Ex. C at 5-6, 25, 27, 29, 37-38.[2] T.C.'s friend, D.O.O., was driving another vehicle, also with passengers, directly behind T.C.'s vehicle. *Id.* According to statements provided by T.C.'s friends to Turkish authorities, around 11:20 p.m., T.C. suddenly began driving his vehicle faster after they passed a speed bump in the road. *Id.* at 5, 25, 27, 29, 38. T.C.'s vehicle approached a curve in the road, and according to T.C.'s friends, T.C. was driving too fast through the bend. *Id.* At the same time, there

---

[1] The facts in this section are taken from Türkiye's Request for the Extradition of Eylem Tok ("Extradition Request"), a redacted copy of which is attached hereto as Exhibits A through D. Unredacted copies of these exhibits will be filed under seal.

[2] To the extent documents are included in the appendix, citations will be made to the appendix. All other documents produced in this case will be cited by "ECF No. [Entry No.]." All record citations to the events in Tok's extradition proceedings before the Magistrate Judge are denoted as "Dkt. [Entry No.]  and reference the docket in District of Massachusetts Case Number 24-mj-01365-DLC.

were five individuals with all-terrain vehicles ("ATVs") stopped on the right side of the road just past the bend, trying to fix one of the ATVs that had broken down. *Id.* at 5-6, 25, 27-30, 38. In an attempt to avoid hitting the people on the side of the road, T.C. suddenly turned the steering wheel to the left, but the sudden turn caused the car to skid and crash into them. *Id.* at 38; *see also id.* at 5-6, 25, 27-30. T.C.'s car ended up in a water channel on the opposite side of the road. *Id.* at 5-6, 25, 27-30, 38-39. One of the individuals died from the impact with T.C.'s car; all of the others were injured. *Id.* at 5-6; Ex. D at 16.

According to witnesses, T.C. and his friends had been driving around for some time before the crash, including a stop at a liquor store to purchase cigarettes. Ex. C at 24-25, 27, 29, 37-38. None of the passengers in T.C.'s or D.O.O.'s vehicles reported to authorities that T.C. had been intoxicated, although T.C. fled the scene before any tests could be performed. *Id.* at 6-8, 17, 38; *see also id.* at 13, 25-26, 40. There also did not appear to be any indication that T.C.'s vehicle had malfunctioned. *See generally* Ex. C. T.C. and his friends did not have driver's licenses. *Id.* at 25.

Immediately after the crash, T.C. called his personal driver and Tok. *Id.* at 13, 17. One of Tok's employees told authorities that she and Tok then drove to the scene and took T.C. and two of his friends, D.O.O. and A.K., home. *Id.* at 17; *see also id.* at 25-26, 28, 30, 38. In doing so, Tok allegedly prevented police from observing or recording T.C.'s behavior and demeanor at the scene of the crash and from testing him for alcohol or drug usage. Ex. D at 17-18, 21. Police were also unable to interview D.O.O. and A.K. immediately after the crash. *Id.* at 21; *see also* Ex. C at 25-26, 28, 30, 38.

Additionally, one of the victims had handed his phone to Z.H.D., who had been in D.O.O.'s car at the time of the crash, and asked him to use the flashlight feature to examine the victim's head wound. Ex. C at 7, 28. Afterwards, Z.H.D. inadvertently put the victim's phone in his own

4

pocket and then left the scene in D.O.O.'s car. *Id.* When he realized he still had the victim's phone, Z.H.D. attempted to give it to K.A. who was a passenger in D.O.O.'s vehicle and was heading back toward the scene of the crash. *Id.* at 7, 26, 28, 30. Instead, K.A. left the phone at the residential complex where he and others had gathered, where it was recovered by security guards. *Id.* While D.O.O. was telling the security guards about the accident, Tok allegedly pushed D.O.O. into a car and took the phone from the security guards, saying that she knew the owner and would give it to him. *Id.* at 7, 26, 28, 36; *see also id.* at 32. Meanwhile, D.O.O.'s mother had given her name and phone number to the security guards, to which she stated Tok reacted by questioning why she gave out her information and saying, "I wish you hadn't." *Id.* at 7, 32, 34. The security guards reported that they had otherwise intended to provide the phone to police. *Id.* at 35.

Thereafter, Tok had her employee bring T.C. to her residence while she and T.C.'s driver drove back to the scene of the crash. *Id.* at 13, 17. However, Tok and the driver turned around and returned to her residence as soon as they saw a police presence. *Id.* The driver later found the victim's phone in his car, under the seat where Tok had been sitting. *Id.* at 14. The driver reported finding the phone to Tok's ex-husband's brother—who consulted Tok's ex-husband's attorney, who in turn instructed the driver to provide the phone to the police, which he did. *Id.* at 7, 14.

Tok's employee told authorities that she then took Tok and T.C. to the airport. *Id.* at 17-18; *see also id.* at 7, 14, 22. Surveillance footage from Tok's residential complex and the airport corroborate the employee's account. *Id.* at 7, 44. According to surveillance footage at the airport, Tok and T.C. arrived at the EgyptAir ticket sales office around 2:35 a.m. on March 2, 2024, only three hours after the crash. *Id.* at 8, 42. Tok purchased one-way tickets to Cairo, Egypt, for herself and T.C. in cash. *Id.* at 8, 41. Tok and T.C. traveled to Cairo and continued on to the United States, landing in New York later that day. *Id.* at 8.

### III.    Procedural Background

On March 6, 2024, Turkish authorities issued an arrest warrant for Tok for the offense of Protecting an Offender. Ex. C at 53. This document, titled "Arrest Warrant," was issued by the Istanbul 7th Criminal Judgeship of Peace. *Id.* It identifies the suspect as Tok and lists the "Imputed Offence" as Protecting an Offender in violation of Article 283/I of the Turkish Criminal Code. *Id.* In the decision accompanying the arrest warrant, the judge found "the existence of concrete facts indicating the existence of strong suspicion pointing to commission of an offence, the suspect committed the offence imputed on her and there has been a reason for detention." *Id.* at 51. The judge further found, "by taking into consideration the amount of sanctions foreseen . . . for the offence imputed on the suspect, the upper limit of the penalty and the existence of concrete evidence containing strong suspicion in the file pointing to commission of the offence by the suspect, it has been decided as follows to issue an arrest warrant for the suspect to detain her . . . ." *Id.* On March 13, 2024, Turkish authorities issued a second arrest warrant for Tok for the offense of Destroying, Concealing or Altering Evidence. *Id.* at 56. This document, again titled "Arrest Warrant," was also issued by the Istanbul 7th Criminal Judgeship of Peace. *Id.* It identifies the suspect as Tok and lists the "Imputed Offence" as Destroying, Concealing or Altering Evidence of an Offence in violation of Article 281/1 of the Turkish Criminal Code. *Id.*

On April 3, 2024, Türkiye transmitted its Extradition Request to the United States. Ex. A at 4. Attorneys at the Departments of State and Justice vetted the request. Believing that Tok may be within the jurisdiction of the Southern District of Florida, the U.S. Attorney's Office for that district swore out a complaint for the extradition of Tok on the charge of Protecting an Offender. A magistrate judge in that district issued a warrant for Tok's arrest. Exs. E & F. Tok was arrested in Boston on June 14, 2024.

Thereafter, Türkiye supplemented its extradition request on June 25, 2024. Ex. D. Attorneys at the Departments of State and Justice further vetted this supplement, and an amended complaint for the extradition of Tok on the charges of Protecting an Offender and Destroying, Concealing or Altering evidence was sworn out in the District of Massachusetts on July 1, 2024. Ex. G.[3]

In October 2024, the Magistrate Judge in the District of Massachusetts held an extradition hearing under 18 U.S.C. § 3184. After holding that hearing and considering the parties' extensive briefing, the Magistrate Judge certified Tok's extradition to the Secretary of State under 18 U.S.C. § 3184. Ex. H at 2, 49-50. Among other things, the Magistrate Judge found that (1) he had authority to conduct the extradition proceeding, (2) the court had jurisdiction over Tok because she was arrested in Massachusetts, (3) the Treaty was in full force and effect, (4) the charges of Protecting an Offender, in violation of Article 283 of the Turkish Criminal Code, and Destroying, Concealing or Altering Evidence, in violation of Article 281 of the Turkish Criminal Code, were covered by the Treaty, and (5) there was probable cause to believe that Tok committed these offenses. In reaching these conclusions, the Magistrate Judge rejected Tok's arguments that neither offense was punishable by more than one year in prison and that dual criminality did not exist. *Id.* at 18-23, 25-31. The Magistrate Judge also rejected Tok's contention that she could not be extradited under the Treaty because Türkiye had not formally charged her. *Id.* at 31-40. The Magistrate Judge instead found, consistent with case law considering similarly worded treaties, that the Treaty does not require that Tok be formally charged with an offense to render her extraditable, *id.*, and that the record "establishes unambiguously that Turkish officials view Tok as a suspect," *id.* at 39. The Magistrate Judge issued the corresponding certification order on February 19, 2025. Ex. I.

---

[3] Because Tok was already in custody, no new arrest warrant was sought.

On March 19, 2025, Tok filed her habeas petition and accompanying memorandum of law in the District of Massachusetts, seeking to vacate the certificate of extraditability and to be immediately released from custody. *See Tok v. Kyes*, No. 25-cv-10649, Doc. 1 (D. Mass.). Upon motion from the United States, the District of Massachusetts transferred the habeas petition to this district because Tok was, and continues to be, physically detained in Rhode Island. *Id.*, Doc. 24. Following the transfer, Tok filed an amended petition for a writ of habeas corpus and corresponding memorandum of law in support of her habeas petition. ECF Nos. 29, 29-1. Tok raises a number of claims challenging the Magistrate Judge's certification of extradition: (1) She cannot be extradited under the Treaty because she has not been formally charged in Türkiye; (2) The arrest warrants submitted by Türkiye do not comply with the Treaty; (3) Her arrest in the United States was unlawful and violated her rights under the Fourth and Fifth Amendments to the Constitution; (4) The charges for which extradition is sought are not covered by the Treaty because they do not carry a penalty of deprivation of liberty "exceeding one year or more," as required by the Treaty; (5) The charges for which extradition is sought are not extraditable offenses under the Treaty because dual criminality is lacking; and (6) The record does not contain sufficient competent evidence to establish probable cause that she committed the offenses sought for extradition. ECF No. 29-1. As explained below, each of her arguments is without merit.

## ARGUMENT

### I.  Each of Tok's Bases for Relief Are Without Merit

In the extradition context, habeas corpus review is available "only to inquire [1] whether the magistrate had jurisdiction, [2] whether the offense charged is within the treaty and [3], by a somewhat liberal extension, whether there was *any* evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925) (emphasis added); *see also Kin-Hong*, 110 F.3d at 110. In conducting these inquiries, the

extradition judge's factual determinations are reviewed solely for clear error. *In re Extradition of Howard*, 996 F.2d 1320, 1329 (1st Cir. 1993). Questions of law, including question involving the interpretation of a treaty, is reviewed *de novo* where "no deference is due to the trier." *Id.* "The standard of review applicable to mixed questions [of law and fact] usually depends upon where they fall along the degree-of-deference continuum: the more fact-dominated the question, the more likely it is that the trier's resolution of it will be accepted unless shown to be clearly erroneous. *Id.* at 1328 (citing *United States v. Mariano*, 983 F.2d 1150, 1158-59 (1st Cir. 1993)).

"Habeas corpus, it is well known, is not a neutral proceeding in which the petitioner and the State stand on an equal footing. Rather, it is an asymmetrical enterprise in which [the petitioner] seeks to overturn a presumptively valid judgment." *Skaftouros v. United States*, 667 F.3d 144, 157 (2d Cir. 2011) (internal quotation marks and citations omitted). Habeas review is "not meant to be 'a means for rehearing what the magistrate already decided.'" *Koskotas*, 931 F.2d at 171 (quoting *in re Extradition of Manzi*, 888 F.2d 204, 205 (1st Cir. 1989) (quoting *Fernandez*, 268 U.S. at 312)); *see also Kin-Hong*, 110 F.3d at 117 (magistrate's findings are entitled to a "fairly deferential review") (citations omitted). The burden is on the petitioner to show by a preponderance of evidence that she is held contrary to the Constitution, law, or the treaties of the United States. *Walker v. Johnston*, 312 U.S. 275, 286 (1941); *Skaftouros*, 667 F.3d at 157-158 (holding that the habeas court erred by imposing the burden of proof on the government to show that extradition certification was proper); *see also Parke v. Raley*, 506 U.S. 20, 31 (1992) ("[T]he presumption of regularity that attaches to final judgments makes it appropriate to assign a proof burden to the [habeas petitioner].").

Unlike criminal statutes, extradition treaties are to be construed liberally in order to effectuate their purpose, namely, the surrender of fugitives to the requesting country. *See Factor*

*v. Laubenheimer*, 290 U.S. 276, 303 (1933) ("Extradition treaties are to be liberally, not strictly, construed."). Even where a treaty's text is ambiguous, if it "reasonably accommodates" the government's construction, the court "defers to that construction whether or not it is a construction we would adopt de novo." *Aguasvivas v. Pompeo*, 984 F.3d 1047, 1058 (1st Cir. 2021) (citing *Kin-Hong*, 110 F.3d at 110).

### A.     The Treaty Does Not Require Formal Charges

Nothing in the Treaty requires Türkiye to issue a formal charge, such as an indictment or criminal complaint, before Tok can be extradited. Article 1 of the Treaty provides for the extradition of persons "who are being prosecuted for or have been charged with an offense, or convicted of an offense, or are sought by the other Party for the enforcement of a judicially pronounced penalty for an offense . . .." Ex. A at 9. There is no reference to formal charges or indictment. If formal charges were required to obtain extradition in a pre-conviction case such as this one, there would be no need for Article 1 to expressly cover both individuals "who are being prosecuted" *and* "who have been charged." Indeed, the alternative phrasing of the treaty language signals that the treaty partners intended to allow for extradition of a person who has been "charged" with an offense irrespective of whether the person is being prosecuted for the offense. *See Aguasvivas*, 984 F.3d at 1058 (declining to adopt interpretation that would render treaty language "entirely superfluous").

As the Magistrate Judge found, this interpretation is consistent with the plain meaning of the verb "to charge": "[t]o accuse (a person) of an offense." Charge (vb.), Black's Law Dictionary (12th ed. 2024). In arguing to the contrary, Tok relies on the meaning of the noun "charge," which is a "formal accusation of an offense as a preliminary step to prosecution." Charge (n.), Black's Law Dictionary (12th ed. 2024). But Article 1 does not refer to "a charge," the noun, but rather to

persons who "have been charged," the verb—in other words, persons, like Tok, who have been accused of an offense. Indeed, the record establishes that Tok is accused of violating Article 281 and Article 283 of the Criminal Code of Türkiye. *See, e.g.*, Ex. D at 16, 24-25.

The omission of any reference to a charging document in Article 7 of the Treaty, which lists the items that must be included in the extradition request, further confirms this reading. Ex. A at 14-15 (extradition request must contain the warrant for arrest, a statement of the facts, evidence sufficient to justify arrest and committal for trial, evidence sufficient to establish that the person sought is the person named in the warrant, and the text of the laws governing the offense, punishment, and statute of limitations). As the Magistrate Judge found, "the fact that Türkiye and the United States in the Treaty did not require the extradition file to contain any document regarding a charge in Article 7 reinforces that they did not intend to require the fugitive to be formally charged in Article 1." Ex. H at 34 (citing *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1448, n.3 (9th Cir. 1987)); *see also Manrique v. Kolc*, 65 F.4th 1037, 1043 (9th Cir. 2023) ("our rules of interpretation militate against reading in a requirement of particular formal charges where the treaty makes no such specification").

Every circuit to consider arguably less flexible language in extradition treaties has concluded that formal charges are not required and that extradition for further investigation and prosecution is permissible. For example, as a matter of first impression, the Seventh Circuit found that similar language in the U.S.-Sweden Extradition Treaty did not require formal charges. *Matter of Assarsson*, 635 F.2d 1237 (7th Cir. 1980), *cert. denied* 451 U.S. 938 (1981). The extradition request in *Assarsson* included an arrest warrant issued by a Swedish court, although no formal charging document had yet been filed. *Id.* at 1239. Like the Treaty here, the treaty in *Assarsson* provided for the extradition of "those persons found in its territory *who have been charged* with

11

or convicted of any of the offenses specified in Article II . . .." *Id.* (quoting U.S.-Sweden Treaty) (emphasis added). The Seventh Circuit found that the "word 'charge' is thus used in contrast to 'convict'" and the term "charged" "is used in the generic sense only to indicate 'accused.'" *Id.* The court found that the documents that must accompany the extradition request—including a "'duly certified or authenticated copy of the warrant of arrest or other order of detention'"—did not include a formal charging document. *Id.* at 1243 (quoting U.S.-Sweden Treaty). The absence of a requirement that the requesting party provide a copy of a charging document in the extradition request led the court to conclude that formal charges were not a prerequisite to extradition. *Id.*

In *Emami*, the Ninth Circuit relied on the reasoning of *Assarsson* to hold that an individual sought for "'detention for investigation'" without formal charges could be extradited under the terms of the U.S.-Germany Extradition Treaty. 834 F.2d at 1446. That treaty provided for the extradition of persons "'*who have been charged with an offense* or are wanted by the other Contracting Party for the enforcement of a judicially pronounced penalty or detention order . . ..'" *Id.* at 1448 (quoting U.S.-Germany Treaty) (emphasis added). Like the treaties here and in *Assarsson*, the U.S.-Germany Treaty required the requesting party to include in the extradition request the arrest warrant but not a formal charging document. *Id.*

The Second Circuit weighed in on this issue in *Sacirbey v. Guccione*, 589 F.3d 52 (2d Cir. 2009). There, the applicable treaty "authorize[d] the extradition of an individual *who has been 'charged'* with a crime." *Id.* at 54 (quoting the treaty) (emphasis added). Despite that "Bosnia had failed to charge him formally with an extraditable offense," the Second Circuit agreed that the interpretation of "charged" did not require a formal charging document because "it gives meaning to treaty language stating that an individual must be 'charged' with an offense in order to be extradited, while avoiding unwarranted incursions into the fine details of foreign criminal

procedure." *Id.* at 65.[4] Ultimately the Second Circuit held Sacirbey was not extraditable, not because formal charges were lacking, but because the Bosnian court that issued his arrest warrant had been dissolved, and thus Bosnia could not satisfy the requirement of providing a valid arrest warrant with the extradition request. *Id.* at 66-67.

In *Manrique*, the Ninth Circuit went even further and held that the U.S.-Peru Extradition Treaty, which required Peru to submit "a copy of the charging document" with its extradition request, still did not mandate a "formal charge" because the treaty there provided for extradition of persons "'the authorities in the Requesting State *have charged with*, found guilty of, or sentenced for, the commission of an extraditable offense.'" 65 F.4th at 1041-43 (quoting U.S.-Peru Treaty) (emphasis added). Because "the ordinary meaning of the verb 'charge' is to generally accuse someone of a crime," the "charging document" requirement of the U.S.-Peru Treaty, which "specifie[d] no particular document," was satisfied by a document that identified the crimes the fugitive was accused of and summarized the supporting evidence. *Id.*

Although in dicta, the First Circuit commented on this issue in *Aguasvivas*, 984 F.3d at 1060. There, the court stated, "we readily agree with the holdings and the rationale in both *Emami* and *Assarsson*" and "we could rule for the government in this case were the language of this treaty materially similar to the language of those treaties." *Id.* As the First Circuit alluded to, the language in the U.S.-Dominican Republic Extradition Treaty at issue in *Aguasvivas* is materially different from the treaties addressed in *Assarsson* and *Emami* and the U.S.-Türkiye Treaty. The U.S.-Dominican Republic Treaty required, in addition to an arrest warrant, "'a copy of the document setting forth *the charges* against the person sought.'" *Id.* at 1055 (quoting U.S.-Dominican

---

[4] Similarly, the Ninth Circuit chose not to wade into whether there had been compliance with foreign criminal procedure in *Emami* "both out of respect for German sovereignty and because we recognize the chance of erroneous interpretation." 834 F.2d at 1449.

Republic Treaty) (emphasis added). In considering whether an arrest warrant could do double duty, the First Circuit held that such a reading "would render superfluous a relatively bespoke requirement" of a separate document setting forth the charges—a requirement not present in the U.S.-Türkiye Treaty.[5] *Id.* at 1061.

Contrary to Tok's claim (ECF No. 29-1 at 9), the Fourth Circuit's decision in *Vitkus v. Blinken*, 79 F.4th 352 (4th Cir. 2023), does not change the analysis. There, the U.S.-Lithuania Extradition Treaty specifically required "'a copy of the charging document.'" *Id.* at 363 (quoting U.S.-Lithuania Treaty). In the face of this explicit requirement, the Fourth Circuit found that the treaty "requires a discrete document that initiates criminal charges." *Id.* at 363. In contrast, there is no such provision in the U.S.-Türkiye Treaty. Tok attempts to downplay this distinction, ECF No. 29-1 at 9, by claiming the Fourth Circuit was analyzing the meaning of the verb "to charge" rather than the requirement of Article 8 § 3(b) of the U.S.-Lithuania Treaty that the extradition request includes "a copy of the charging document," which the court referred to as "the charging document mandate." *Vitkus*, 79 F.4th at 355. But this claim ignores the plain holding of *Vitkus*:

> To summarize, the charging document mandate spelled out in Article 8 § 3(b) of the Treaty requires the production of a discrete charging document—that is, the instrument (comparable to an indictment, information, or complaint) that has initiated criminal charges against Vitkus. And, in these circumstances, the Notification of Suspicion and Suspect Decisions have not initiated criminal charges against Vitkus. As a result, those documents are not "*the* charging document" required by Article 8 § 3(b).

---

[5] Additionally, unlike the U.S.-Türkiye Treaty, Article 1 of the U.S.-Dominican Republic Treaty does not specify that a person may be extradited if they are "charged" with an offense; it references only individuals who are sought "for prosecution or for imposition or service of a sentence." Extradition Treaty between the Government of the United States of America and the Government of the Dominican Republic, Jan. 12, 2015, T.I.A.S. 16-1215. Because the U.S.-Türkiye Treaty permits the extradition of individuals who have been "charged" with an extraditable offense, Tok is mistaken that *Aguasvivas* stands for the proposition that a warrant, without a corresponding charging document, is insufficient to justify extradition. ECF No. 29-1 at 9 (citing *Aguasvivas*, 984 F.3d at 1058).

*Id.* at 367 (emphasis in original). In other words, the focus of the *Vitkus* court was not whether Article 1 of the U.S.-Lithuania Treaty, which provided for extradition of "persons whom the authorities in the Requesting State have charged with . . . an extraditable offense," but whether the "Notification of Suspicion and Suspect Decision" satisfied the requirement of Article 8 § 3(b) that the extradition request include "a copy of the charging document." *Id.* That is an entirely different issue than the one Tok raises in this case. Accordingly, the Court should reject Tok's attempt to read into the treaty a requirement – a formal charging document – that does not exist.

Tok next argues, ECF No. 29-1 at 7, that the Court must find she is "wanted for prosecution" to be extraditable. As the Magistrate Judge found, Türkiye has unequivocally confirmed its intent to prosecute Tok. Ex. H at 39; *see also* Ex. D at 16 ("Eylem Tok committed the offences of Destroying, Concealing or Altering Evidence and Protecting the Offender, regulated in the Articles 281 and 283 of Turkish Penal Code respectively."); *id.* at 24 ("There is no legal situation, preventing the filing of a public lawsuit and conducting trial against Eylem Tok."); *id.* ("the defendant must be tried"), *id.* at 25 (discussing "carry[ing] out investigation *and prosecution* about [Tok] due to both offences" of Protecting an Offender and Destroying, Concealing or Altering Evidence) (emphasis added).

Because Türkiye's intent to prosecute Tok is clear, her argument that Türkiye should have used the provisions of the Treaty governing requests for mutual assistance to obtain her statement, ECF No. 29-1 at 11-14, is misplaced and relies on a fundamental misunderstanding of Türkiye's extradition request. As a preliminary matter, it is irrelevant that the United States and Türkiye have their treaties for extradition and mutual legal assistance in a single document.  The treaties serve different purposes, and Tok does explain why the treaty with Türkiye would operate any differently than extradition and mutual legal assistance treaties that were negotiated separately.  ECF No. 29-

1 at 11-13. In any event, Türkiye is not seeking Tok's extradition solely to take her testimony; it is seeking to prosecute her for the Articles 281 and 283 offenses. The Turkish prosecutor should not be penalized for wanting to gather all the relevant evidence—including Tok's statement—before instituting formal charges.[6] Likewise, Tok should not be rewarded for fleeing and thus preventing the prosecutor from obtaining this evidence.

### B.    The Arrest Warrants Meet the Requirements for Extradition under the Treaty

Article 7 of the Treaty requires the extradition request include "[a] warrant of arrest issued by a judge or other competent judicial officer." Ex. A at 14. The Treaty does not identify any other qualification for the arrest warrant. Both of the arrest warrants here were issued by the Istanbul 7th Criminal Judgeship of Peace. Ex. C at 53, 56. Both identify the suspect, Tok, and the respective offense charged. *Id.* Nothing more is required, particularly where, as here, the Treaty is "to be construed liberally in favor of enforcement because it is 'in the interest of justice and friendly international relations.'" *Kin-Hong*, 110 F.3d at 110 (quoting *Factor*, 290 U.S. at 293).

Moreover, it is not the Court's role to second-guess Türkiye's determination of what constitutes a valid arrest warrant. *Basic v. Steck*, 819 F.3d 897, 901 (6th Cir. 2016) (refusing to "second-guess" Bosnian government's determination of what constitutes an arrest warrant); *see also Noeller v. Wojdylo*, 922 F.3d 797, 805 (7th Cir. 2019) ("Extradition proceedings are not vehicles for United States federal courts to interpret and opine on foreign law,' and American extradition courts therefore have consistently cautioned against doing so . . . ."); *Cornea v. United States Att'y Gen.*, 771 F. App'x 944, 947 (11th Cir. 2019) (deferring to Greece's interpretation of its own law regarding service of process); *see also Nezirovic*, 2013 WL 5202420, at *15 ("It would

---

[6] Indeed, as demonstrated by the holdings of the cases cited above, it is not uncommon for foreign countries to bring formal charges only after the fugitive returns to that country.

be a grave insult for this court to presume to tell the Government of Bosnia and Herzegovina what is or is not legitimate under Bosnian law."). Deference to Türkiye's interpretation of its own laws is also consistent with the principle of international comity and "respect for the sovereignty of other nations," *Assarsson*, 635 F. 2d at 1244, and avoids the risk that a U.S. court might erroneously interpret the law of a foreign country, *id.* ("The possibility of error warns us to be even more cautious of expanding judicial power over extradition matters."); *see also Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court*, 482 U.S. 522, 546 (1987) ("[W]e have long recognized the demands of comity in suits involving foreign states, either as parties or as sovereigns with a coordinate interest in the litigation."). Indeed, even the court in *Sacirbey*, on which Tok relies, ECF No. 29-1 at 16, did not rule that the arrest warrant there was invalid because of an issue with the form or content of the warrant, but rather because the court that issued it had been dissolved and thus, could not enforce the warrant, making it invalid. 589 F.3d at 67. Further, that Türkiye has previously sought the extradition of individuals who have either already been indicted or convicted, *see* ECF No. 29-1 at 18, as permitted by the Treaty, does not undermine the fact that the arrest warrants here satisfy the requirements of the Treaty.[7]

Even if the Court were inclined to review Türkiye's arrest warrants, as Tok essentially requests (ECF No. 29-1 at 16-18), the Court would find that they sufficiently establish Türkiye's intent to bring Tok into custody and pursue criminal charges upon her arrival in Türkiye. Tok attempts to undermine the warrants by claiming that they do not mandate her arrest and merely allow authorities to apprehend her to interview her for the purpose of determining "whether she will be arrested." *Id.* at 16. However, her argument misses the point. The very nature of an arrest

---

[7] Tok also fails to provide any reason why she could not raise her legal challenges to the validity of the arrest warrants during criminal proceedings in Türkiye upon her extradition.

warrant is to provide authorization for law enforcement to arrest and detain a person, and there is no reason to believe Türkiye would not seek to bring Tok into custody based on the outstanding warrants. Moreover, Tok's argument fails to recognize that, if Turkish authorities apprehended her for the purpose of interviewing her, she will have already been "arrested" pursuant to the "arrest warrants." In fact, she admits in her brief that, if she were extradited to Türkiye, she would be placed into pre-indictment custody. *See* ECF No. 29-1 at 7 n.9. Thus, Tok has failed to show that the warrants provided in Türkiye's extradition request are anything other than warrants for the purpose of facilitating her arrest.

### C.    Tok Is Punishable by More Than a Year in Prison

Contrary to Tok's argument (ECF No. 29-1 at 21-24), the punishments established by the Turkish statutes under which Tok is charged satisfy the Treaty's requirement in Article 2 that offenses be punishable by "deprivation of liberty at least for a period exceeding one year or by a more severe penalty." Tok does not dispute that the Turkish offense of Destroying, Concealing or Altering Evidence under Article 281 of the Turkish Penal Code carries a maximum penalty of five years' imprisonment and that the Turkish offense of Protecting an Offender under Article 283 likewise carries a maximum penalty of five years' imprisonment. *Id.* However, she claims that she is entitled to reduced sentences for both offenses that would fall below the one year imprisonment requirement. *Id.* She is wrong.

Tok claims her potential punishment on the Article 281 offense would not exceed one year in prison because she would be entitled to a reduced sentence under the Turkish statute because her son's driver turned the cellphone in question into the police. ECF No. 29-1 at 24. Notably, Tok did not direct the driver to turn in the phone, but rather her ex-husband's attorney instructed him to do so. Ex. C at 7, 14. As the Magistrate Judge found, whether the driver acted as Tok's agent

18

under these circumstances is a question for trial in Türkiye, as is the application of the statute providing for a reduced sentence. Ex. H at 21-22 (citing, *inter alia*, *Matter of Extradition of Acevedo*, No. 16-cv-01766-R (KS), 2017 WL 3491749, at *11 (C.D. Cal. Aug. 11, 2017) (given "two clearly disputed versions of facts," court "cannot determine the credibility of the evidence offered by Acevedo against the evidence offered by the Mexican government," which "is a matter for trial in Mexico") and *Freedman v. United States*, 437 F. Supp. 1252, 1266 (N.D. Ga. 1977) (stating, in habeas petition challenging extradition, "presentation of witnesses who testify as to an opposite version of facts will not" eliminate probable cause, and "resolution of such conflicts . . . must await a trial on the merits")); *see also* Ex. D at 20 ("The difference between being in possession of TOK and being in possession of one of her subordinates *will only emerge as a result of the trial.*") (emphasis added).[8]

Tok's argument that any sentence would be reduced by four-fifths because her son's driver turned in the cellphone also ignores Tok's other actions underlying the Article 281 charge: her removal of T.C. and two of his friends from the scene of the crash, which prevented police from observing and questioning them immediately after the incident and from testing T.C. for alcohol and drug use. Ex. D at 17, 21. Tok does not suggest that this conduct would receive a lesser sentence; rather, it is subject to the maximum five years in prison.

Because Tok is subject to more than a year in prison (and thus extraditable) for the Article 281 offense, Article 2(4) of the Treaty permits her extradition on the Article 283 offense regardless of the penalty for that offense. Article 2(4) of the Treaty provides, "When a request for extradition

---

[8] Tok's claim that T.C.'s driver acted as her agent in turning in the phone to police is also an affirmative defense raised in effort to negate her liability, which falls outside the scope of an extradition court's review and is an issue reserved for the Turkish courts. *See*, *e.g.*, *In re Extradition of Martinelli Berrocal*, No. 17-cv-22197, 2017 WL 3776953, at *27 (S.D. Fla. Aug. 31, 2017) (collecting cases).

comprises several separate offenses and extradition has been granted for one of the extraditable offenses, it shall also be granted for other extraditable offenses which could not otherwise fulfill the requirements of paragraphs (1) and (2) above as related to the deprivation of liberty to be served . . . ." Ex. A at 11. In other words, the Court may certify extradition for an offense that does not carry a penalty that deprives the person of liberty for a period exceeding one year, so long as the Court also certifies extradition on a separate offense that does carry such a penalty—here, the Article 281 offense. Moreover, on its face, the Article 283 offense carries a maximum penalty of five years' imprisonment. Ex. D at 22. While Tok has argued that, as T.C.'s mother, she cannot be imprisoned for any period for an Article 283 offense, ECF No. 29-1 at 21, Türkiye has explained that "The decision of not to impose a penalty, which is regulated in the law as a consequence of personal exemption from punishment, is not considered as an obstacle to investigation and prosecution and is not regulated as a decision of 'acquittal' by the court." Ex. D at 24. Rather, "Eylem Tok's status as a mother must be established and certified before the court," *id.* at 22, and to the extent proof of that fact may alter the penalty, "[o]nly the court can make such a decision as a result of the trial." *Id.* at 23. Again, Türkiye's interpretation of its own laws and procedures is entitled to deference. *Assarsson*, 635 F. 2d at 1244; *Emami*, 834 F.2d at 1449. Likewise, longstanding case law confirms that an affirmative defense such as this one fall outside the scope of an extradition court's review. *See*, *e.g.*, *Martinelli Berrocal*, 2017 WL 3776953, at *27 (collecting cases).

### D.    Dual Criminality Exists For Both Offenses

Articles 1 and 2 of the Treaty provide for the extradition of fugitives who have been charged with (1) "Offenses, regardless of whether listed in the Appendix to this Treaty or not, which are punishable under both the federal laws of the United States and the laws of Turkey by

deprivation of liberty at least for a period exceeding one year or by a more severe penalty"; or (2) "Offenses listed in the Appendix to this Treaty which are punishable under both the laws of the Requesting Party and the Requested Party for at least a period exceeding one year or by a more severe penalty." Reading these clauses together, federal law may always be used to establish dual criminality irrespective of whether it is contained on the Treaty's list of extraditable offenses or not, and state law may be used if the offense is listed in the Treaty.

In determining whether an offense is punishable under the laws of both countries, extradition courts properly look to the underlying acts to determine whether, if they had been committed in the United States, they would violate United States federal law, the law of the state in which the hearing is held, or the law of the preponderance of the states, as applicable. *See Cucuzzella v. Keliikoa*, 638 F.2d 105, 107 (9th Cir. 1981); *Manzi*, 888 F.2d at 207. Because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers[,]" *Grin v. Shine*, 187 U.S. 181, 184 (1902); *see also Factor*, 290 U.S. at 303, a court should "approach challenges to extradition with a view toward finding the offense within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981); *see also Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc) ("The point of an extradition treaty after all is to facilitate extradition . . . ."), *cert. denied*, 137 S. Ct. 243 (2016).

The Turkish offenses need not be identical to ours. Indeed, the Supreme Court has held that dual criminality exists "if the particular act charged is criminal in both jurisdictions," even if the name of the offense or the scope of the liability differs in the two countries. *Collins*, 259 U.S. at 312; *see United States v. Riviere*, 924 F.2d 1289, 1302 (3d Cir. 1991) ("[T]he rule of double criminality does not require that the elements, purposes, or punishment for foreign offenses be identical to ours."); *see also* Ex. A at 10 (Treaty, Article 2(1)(b)). As the First Circuit has explained,

"[t]he purpose of the dual criminality requirement is simply to ensure that extradition is granted only for crimes that are regarded as serious in both countries." *Kin-Hong*, 110 F.3d at 114 (citing *United States v. Saccoccia*, 58 F.3d 754, 766 (1st Cir. 1995)).

In her habeas petition, Tok does not challenge the Magistrate Judge's finding that dual criminality exists for the Article 283 offense, but wrongly argues that her conduct does not fall within a corresponding United States law.

To determine what conduct the Court should analyze, it looks to the acts that are criminalized under the foreign statute and the specific conduct of which the fugitive is accused. Here, Article 281 penalizes "[a]ny person who destroys, erases, alters, conceals, or damages evidence of an offence in order to prevent the emergence of the truth." Ex. C at 3. Türkiye alleges that Tok concealed the cellphone from police by taking it from the security guards (who were otherwise planning to turn the phone into police) by lying to them about knowing the owner. When the security guards asked for the phone back, Tok refused.[9] Likewise, Tok concealed evidence of who was driving the car and whether he was intoxicated by removing T.C. and two of his friends from the scene of the crash before they could be interviewed (and the driver immediately identified) and before T.C.'s intoxication level could be tested. *E.g.*, Ex. D at 17-18.[10]

Contrary to Tok's contention, ECF No. 29-1 at 24-25, her conduct falls within item #19 of the Appendix, which lists "***Unlawful obstruction*** of judicial proceedings or proceedings before government bodies or interference ***with an investigation of a violation of a criminal statute, by***

---

[9] Tok's argument that she could not conceal something that was not yet in her possession at the time of her contact with the security guards, ECF No. 29-1 at 26, appears to misconstrue the basis for the offense. She is not alleged to have concealed the phone from the guards, but from the police.

[10] Having found dual criminality based on Tok's taking of the cellphone, the Magistrate Judge did not address this additional factual basis for the Article 281 offense. Ex. H at 40-41, n.34.

influencing, bribing, ***impeding***, threatening, or injuring by any means ***any officer of the court,*** juror, witness, ***or duly authorized criminal investigator***" as an extraditable offense (emphasis added). By concealing the cellphone and witnesses, Tok interfered with an investigation by impeding witnesses and duly authorized criminal investigators.

As the Magistrate Judge found, Tok's conduct also violates 18 U.S.C. § 1512(b)(3). Ex. H at 28-30. That statute prohibits "knowingly . . . engag[ing] in misleading conduct toward another person, with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer . . . of information relating to the commission or possible commission of a Federal offense." Section 1512(b)(3) was designed to "facilitate federal law enforcement's ability to gather information about possible federal crimes—including federal crimes that are not yet under investigation at the time of the offense." *United States v. Bailey*, 405 F.3d 102, 108 (1st Cir. 2005); *accord United States v. Guadalupe*, 402 F.3d 409, 411 (3d Cir.2005). Again, Tok's actions in misleading the security guards so that they would give her the phone and not turn it over to the police frustrated the ability of investigators to gather information about the accident, including potential photos or video of the crash on the cellphone, as well as GPS location and acceleration data maintained on the phone, which could show where the victim was located at the time of impact and the speed at which the victim was thrown.[11]

Having found that dual criminality exists between Article 281 and 18 U.S.C. § 1512(b)(3), the Magistrate Judge did not need to go further.[12] Nevertheless, Tok could also be charged under

---

[11] Tok's reliance on *United States v. Kulczyk*, 931 F.2d 542, 548 (9th Cir. 1991), and *United States v. King*, 762 F.2d 232, 237 (2d Cir. 1985), ECF No. 29-1 at 27, is misplaced. Both decisions rested on the absence of any attempt to mislead, not whether 18 U.S.C. § 1512(b)(3) is limited to witness testimony.

[12] "While it is true that, as a general matter, federal courts of appeals do not rule on issues not decided in the district court, we do have discretion to address issues not reached by the district

18 U.S.C. § 1512(c)(2) in connection with her removal of T.C. and his friends from the crash scene. That statute criminalizes "impairing the availability of other things used in an official proceeding . . . such as witness testimony." *Fischer v. United States*, 144 S. Ct. 2176, 2186 (2024). In removing T.C. and two of his friends from the crash scene, Tok prevented investigators from observing their behavior, taking witness statements, and testing T.C. for alcohol or drug consumption, impairing the availability of this evidence in the investigation.

Because the Article 281 offense falls within the Appendix to the Treaty, the Magistrate Judge could also have considered potential state law charges—here, M.G.L. c. 268, §§ 13B and 13E. Section 13B criminalizes those who:

> willfully, either directly or indirectly . . . mislead . . . another person who is a: (A) witness or potential witness; (B) person who is or was aware of information, records, documents or objects that relate to a violation of a criminal law . . . ; (C) . . . police officer, . . . [or] investigator . . ., with the intent or with reckless disregard for the fact that it may . . . impede, obstruct, delay, prevent or otherwise interfere with: a criminal investigation at any stage, a grand jury proceeding, . . . or other criminal proceeding of any type.

The Supreme Judicial Court has held that conduct is "misleading" if "it reasonably could lead investigators to pursue a course of investigation materially different from the course they otherwise would have pursued." *Commonwealth v. Paquette*, 475 Mass. 793, 801 (2016). In removing T.C., D.O.O., and A.K. from the crash site before they could be interviewed (and the driver immediately identified) and before T.C.'s intoxication level could be tested, Tok lead investigators away from pursuing enhanced charges against T.C. for driving under the influence and from seeking an earlier

---

court when the question is essentially legal and the record is complete." *Kin-Hong*, 110 F.3d at 116 (internal citations omitted) (opting to consider issue not reached by district court where "[w]e have before us the parties' memoranda on probable cause to the district court and the magistrate judge as well as the completed evidentiary record" because it was in "the interest of conserving judicial resources and mindful of the policy that extradition matters [are] to be handled expeditiously").

arrest warrant (before T.C. could flee the country). *E.g.*, Dkt. 73-4 at 17-18. With respect to lying to the security guards about knowing the owner of the cellphone, Tok changed their course of conduct from turning the phone over to police as they originally intended to relying on Tok to return the phone to the victim. *E.g.*, Dkt. 73-3 at 35.

For taking the victim's phone from the security guards, promising to return it to the victim, and subsequently leaving it behind in her driver's car, Tok could also be charged under M.G.L. c. 268 § 13E because she "conceal[ed]" an "object . . . with the intent to impair . . . [its] availability for use in an official proceeding." Tok suggests that her driver ensured the phone was made available to police, Dkt. 143 at 27, but the driver discovered the phone only by chance, and only after Tok insisted on keeping the phone after the security guards asked her to return it and after she demonstrated her intent to conceal by telling D.O.O.'s mother that she wished she had not provided her name and contact information to the security guards. *E.g.*, Dkt. 73-3 at 14, 26, 32, 34, 36.

For these reasons, the Court should find that dual criminality has been established in this case.

### E.    Tok's Invitation for the Court to Evaluate Turkish Law is Inappropriate

Tok also contends that she could not have violated Article 281 because the cellphone is not "evidence" under Turkish law. ECF No. 29-1 at 32. As an initial matter, the Court should decline to entertain this argument because, as discussed above, it not tasked with becoming an expert in foreign law. *E.g.*, *Basic*, 819 F.3d at 901; *Noeller*, 922 F.3d at 805.

In any event, this argument ignores Türkiye's charge that she obstructed the investigation into her son's actions when she removed T.C. and his friends—and associated evidence in the form of their statements and testing T.C. for intoxication—from the crash scene. Moreover, Türkiye

alleges tampering with other evidence: "[Tok] prevented the police or people from finding the cell phone, *which we consider as evidence*, . . . ." Ex. D at 21 (emphasis added). That Türkiye elsewhere indicates the cellphone "might" contain additional evidence such as photos or videos—for example, when describing what *Tok* thought when she took the phone—does not undercut the statement that Türkiye considers the phone itself to be evidence. *See, e.g.*, Ex. D at 21 ("It was proven with witness statements that Eylem Tok took possession of the cell phone belonging to the victim [I.G.], with the belief that it might contain evidence of the accident and with the intention of concealing the evidence.").

Unable to make her argument based on the four corners of the extradition request, Tok relies on an affidavit from a Turkish lawyer purporting to interpret Turkish law. ECF No. 29-1 at 33. But the Magistrate Judge correctly determined that this material—directly contradicting Türkiye's statements in the extradition request that the cellphone is evidence—should not be considered. Ex. H at 24-25. The Magistrate Judge's determination is particularly entitled to deference given the abundance of case law holding that a fugitive may not introduce evidence that contradicts the evidence the government submits on behalf of the requesting country, but she may only introduce evidence explaining the submitted evidence. *See Charlton v. Kelly*, 229 U.S. 447, 457-58 (1913); *Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006) ("Courts have traditionally distinguished between inadmissible 'contradictory evidence,' which merely conflicts with the government's evidence, and admissible 'explanatory evidence,' which entirely eliminates probable cause.").[13] Indeed, "extradition proceedings are not to be converted into a dress rehearsal

---

[13] *See also Jimenez v. Aristeguieta*, 311 F.2d 547, 556 (5th Cir. 1962) ("The accused is not entitled to introduce evidence which merely goes to his defense but may offer limited evidence to explain elements in the case against him, since the extradition proceeding is not a trial of the guilt or innocence but of the character of a preliminary examination held before a committing magistrate to determine whether the accused shall be held for trial in another tribunal."); *Hooker v. Klein*, 573

trial." *Koskotas*, 931 F.2d at 175 (internal quotation marks and citations omitted). Tok's argument that the cellphone is not evidence is both a factual and legal challenge that is best left for trial in Türkiye. *Acevedo*, 2017 WL 3491749, at *11; *Freedman*, 437 F. Supp. at 1266.

### F.    Tok's Fourth Amendment and Due Process Rights Have Not Been Violated

Tok claims that, because Türkiye's initial extradition request omitted paragraph 3 of Article 283, her arrest for that offense and continued detention violate her rights under the Fourth Amendment and Due Process Clause of the U.S. Constitution. The Fourth Amendment provides, in relevant part, that "no warrants shall issue, but upon probable cause, supported by oath or affirmation." Here, Tok's arrest warrant was based on a complaint for extradition under 18 U.S.C. § 3184. Exs. E & F. Among other things, the complaint relayed that the Treaty was in full force and effect, stated that Türkiye sought Tok's extradition for the Article 283 offense, and summarized the facts underlying that offense. *Id.* It also attached Türkiye's full extradition request, with the prosecutor's summary and witness statements, as an exhibit. *Id.* ¶ 8. Thus, there was sufficient probable cause for the issuance of the warrant.[14] Additionally, since that time, Türkiye provided additional information that addressed Tok's concerns and caused the United States to file an Amended Complaint. Dkt. 51. That supplementary information arguably renders Tok's claims moot.

Tok's reliance on *Parretti v. United States*, 122 F.3d 758 (9th Cir. 1997), does not change

---

F.2d 1360, 1368 (9th Cir.), *cert. denied*, 439 U.S. 932 (1978) (("[T]he extraditing court properly may exclude evidence of alibi, of facts contradicting the government's proof, or of a defense such as insanity . . . . Because of the limited function of an extradition proceeding and the limited participation permitted of the fugitive, the order of the court does not reflect a consideration of all the merits of the case.").

[14] This is confirmed by the Magistrate Judge's certification order, which found probable cause that Tok had committed the alleged offenses.

the analysis. First, as Tok notes, the Ninth Circuit withdrew its opinion in *Parretti* based on the fugitive disentitlement doctrine, and thus is not good law. *Parretti v. United States*, 143 F.3d 508 (9th Cir. 1998). But even if the Court were to consider the withdrawn opinion, it is inapposite. *Parretti* concerned a provisional arrest request—that is, before an extradition request was submitted—where the arrest warrant was based solely on the existence of a foreign arrest warrant, without any of the reports, witness statements, or other evidence of the type relied upon here.

Additionally, any error in Türkiye's omission of paragraph 3 of Article 283 from its initial extradition request was cured by Türkiye's inclusion of the missing paragraph in its supplement, Ex. D, and the issuance of an amended complaint against Tok for extradition on both the Article 281 and Article 283 offenses. Ex. G. As discussed above, Tok is extraditable on both offenses.[15] Further, Tok acknowledges that "[n]othing precludes a requesting party from submitting serial extradition requests regarding the same allegations, because the principle of double jeopardy does not apply to successive extradition proceedings. Dkt. 3 at 19 (citing *Collins v. Loisel*, 262 U.S. 426, 429 (1923)). Thus, any error in her initial arrest warrant was harmless.

Finally, because there was no error in her arrest, detention, or the Magistrate Judge's finding of extraditability, and she in fact challenged her detention and extraditability before the Magistrate Judge and now in the instant habeas petition, Tok's due process rights have not been violated.[16]

---

[15] Tok's argument rests on her conclusion that she is not punishable by more than a year in prison on the Article 283 offense. As discussed above, *supra* 19-20, Türkiye's view is that "Eylem Tok's status as a mother must be established and certified before the court," Ex. D at 22, and to the extent proof of that fact may alter the penalty, "[o]nly the court can make such a decision as a result of the trial." *Id.* at 23. Türkiye's interpretation of its own laws is entitled to deference. *E.g.*, *Assarsson*, 635 F. 2d at 1244; *Emami*, 834 F.2d at 1449.

[16] Tok briefly alleges that her extradition would violate the Convention Against Torture, and she acknowledges that any humanitarian claim is not ripe for judicial review because the

## CONCLUSION

For the foregoing reasons, the Court should deny Tok's petition for a writ of habeas corpus, thus allowing her extradition to Türkiye.

Respectfully submitted,

SARA M. BLOOM
United States Attorney

By:    /s/ Paul F. Daly, Jr.
PAUL F. DALY, JR.
Assistant U.S. Attorney

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Paul F. Daly, Jr.
PAUL F. DALY, JR.
Assistant U.S. Attorney

Dated: September 29, 2025

---

Secretary of State has not yet rendered a decision on Tok's surrender.  ECF No. 29-1 at 3-4.  The United States agrees that such a claim is unripe but also asserts that, due to the rule of non-inquiry and applicable statutes and regulations, Tok's humanitarian claims will never be justiciable. *Kin-Hong*, 110 F.3d at 111 ("questions about what awaits the [fugitive] in the requesting country" are reserved for the Secretary and are not judicially reviewable); *Munaf v. Geren*, 553 U.S. 674, 700 (2008) ("Habeas corpus has been held not to be a valid means of inquiry into the treatment the [fugitive] is anticipated to receive in the requesting state.") (internal quotations and citation omitted).