UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| EYLEM TOK,<br>        Petitioner,<br><br>         v.<br><br>MICHAEL NESSINGER, WARDEN,<br>        Respondent. | Docket No. 1:25-CV-00371-MRD-PAS |

## EYLEM TOK'S REPLY MEMORANDUM IN SUPPORT OF HER PETITION FOR A WRIT OF HABEAS CORPUS

Petitioner Eylem Tok ("Petitioner" or "Ms. Tok") requests that this Court issue a writ of habeas corpus because her detention and certification for extradition violate the constitution, treaties, and laws of the United States. Türkiye has not charged Ms. Tok with any crime and is not prosecuting her, nor has it provided arrest warrants to support its extradition requests, as is required under the Treaty on Extradition and Mutual Assistance in Criminal Matters Between the United States of America and the Republic of Türkiye, U.S.-Turk., June 7, 1979, 32 U.S.T. 3111 (hereinafter, the "Treaty"). Ms. Tok was arrested without probable cause, and her continued detention is therefore unconstitutional. The two allegations for which extradition is sought fail to meet the requirements of the Treaty because Ms. Tok could not be punished by imprisonment for more than a year on either of them, and because the allegations do not satisfy the Treaty's dual criminality standard. Moreover, one of the allegations fails to state a violation of Turkish law. The extradition that Türkiye seeks, and the government intends to execute, is therefore unlawful. This Court has the authority and the duty to review the legal issues raised by Ms. Tok, including the interpretation of the Treaty, de novo. *See Aguasvivas v. Pompeo*, 405 F. Supp. 3d 347, 355 n.11 (D.R.I. 2019); c*f. Hilton v. Kerry*, 754 F.3d 79, 86 (1st Cir. 2014); *Aguasvivas v. Pompeo*,

1

984 F.3d 1047, 1054-58 (1st Cir. 2021). This Court should grant Ms. Tok's petition for release and order an immediate discharge of the conditions imposed on her.

I.   **ARGUMENT**

   **A. Ms. Tok's Detention and Extradition are Unlawful**

   1.   **The Treaty Authorizes Extradition of Only Persons "being prosecuted for or…charged with an offense." Ms. Tok is Neither.**

The government fails to acknowledge the full text of the Treaty and in particular its provision on mutual assistance. Instead, it urges the Court to adopt a broad reading of the term "charged" as generally accused that the full text of the Treaty does not support. The mutual assistance provision provides mechanisms for effecting investigations related to accused persons, whereas the extradition portion of the treaty specifically requires that the person sought must be "prosecuted or…charged" for the extradition to be valid. Treaty, Chapter I, Section II, Article 7(1). *See* Treaty, Chapter I, Section I, Article 1 (persons "who are being prosecuted for or have been charged with an offense" may be extraditable). Both the plain text of the "charged" provisions and the full text of the Treaty support the simplest and clearest interpretation: charged means charged. No charge has issued in this case even though it has been more than a year since the underlying incident, and Ms. Tok therefore cannot be extradited.

The government's proposed interpretation of the term "charged" in the Treaty would read the mutual assistance provisions of the Treaty, and the limitations on those provisions, out of the Treaty. The mutual assistance chapter restricts Türkiye from dragging Ms. Tok from the United States to Türkiye in order to obtain her statement, a limitation which it is trying to abuse extradition in order to circumvent. (*See* D. 29-1, at 12-13.) None of the cases cited by the government in support of a broader reading of the term "charged" interpret a treaty that also

contains a mutual assistance provision. (D. 30[1], at 11-16; *see* D. 29-1, at 13-14 n.10 (listing treaties interpreted).) A treaty must be interpreted like a statute, and a fundamental principle of statutory (and treaty) construction is to view provisions in context of the whole and attempt to give meaning to the entire document. *Cf. GE Energy Power France v. Outokumpu Stainless USA*, 140 S. Ct. 1637, 1645 (2020) (noting that construction of treaty starts with its text, and looking to context of disputed provision within entire treaty to interpret it). It matters that the extradition and mutual assistance provisions were contained in a single treaty, because it indicates that they were negotiated together and intended to work together rather than superseding one another. *See Medellin v. Texas*, 552 U.S. 491, 507 (2008) (negotiation and drafting history is aid to treaty interpretation). The government's assertion that extradition and mutual assistance could have been the subject of separate treaties (D. 30, at 15) is counterfactual and irrelevant—the fact is that the Treaty was negotiated, signed, and ratified as one document, and the government can no more split it in two than it could examine a statutory provision in isolation from the rest of the statutory scheme. A view of the extradition chapter that entirely circumvents the mutual assistance process would render it surplusage. *See Sacirbey v. Guccione*, 589 F.3d 52, 66 (2d Cir. 2009) (interpretations of treaties rendering provisions redundant or surplusage should be avoided). For that reason, the documents seeking to take Ms. Tok's statement do not satisfy the requirements of the Treaty for extradition.

Even if this Court were to interpret the term "charged" to include informal accusations, the documents submitted by Türkiye, which clearly indicate the process is in an investigatory stance, cannot satisfy that definition. (*See* D. 16, Ex. C, at 53 (prosecutor's office to be contacted

---

[1] "D." refers to docket entries in this court. Docket entries 16 and 21 include the major exhibits in this matter and are cited where relevant. The Magistrate Judge's Memorandum and Order, D. 16, Ex. H, is cited to the page numbers used in the decision itself (*e.g.,* *6, is page 6 of the memorandum, but page 7 of the PDF).

"for taking her statement" after which arrest "will be evaluated"), 56 ("statement shall be taken" and then it will be "evaluated whether she will be arrested")). Courts that have concluded that "charged with" treaty language does not require formal charges have relied upon foreign governments' statements that a person either has been actually charged or is "wanted for prosecution" to satisfy the treaty language. *See Emami v. U.S. Dist. Ct. for N. Dist. of California*, 834 F.2d 1444, 1449 (9th Cir. 1987) (German government's statement that person "is wanted for prosecution" satisfied treaty permitting extradition of "charged" individuals); *Republic of France v. Moghadam*, 617 F. Supp. 777, 781 (N.D. Cal. 1985) (treaty language referring to persons "charged with" a crime was satisfied by arrest warrant and "a statement by the [foreign nation] that [the person sought] has been charged with violating [foreign] laws"). The government only asserts in response that Türkiye has made qualifying statements in this case. (D. 30, at 15-16.)

To support the notion that "Türkiye has unequivocally stated its intent to prosecute" Ms. Tok, the government cites four statements in the extradition request, none of which actually state an intent to prosecute. (D. 30, at 15.) First, the government cites a statement that Ms. Tok "committed the offences." (D. 30, at 15 (quoting D. 16, Ex. D, at 16).) This is an allegation, not a statement of intent. Second, the government cites a statement that "there is no legal situation, preventing the filing of a public lawsuit." (D. 30, at 15 (quoting D. 16, Ex. D, at 24).) This, once again, is not a statement of intent to prosecute, but a description of whether or not there are obstacles to prosecution. Specifically, in context, this statement refers to the Turkish government's argument that Ms. Tok could be prosecuted for the Article 283 Protecting an Offender Charge, even though she cannot be punished for such offense under Turkish law due to her status as T.C.'s mother. (D. 16, Ex. D, at 24.) Third, the government cites a statement that "the defendant must be tried." (D. 30, at 15 (quoting D. 16, Ex. D, at 24).) Not only is this not a

4

statement of intent, but it is taken out of context: this statement, too, is part of the Turkish government's argument that Ms. Tok can be prosecuted for Article 283, and is a description of whether "the reasons for personal exemption from punishment will constitute an obstacle to the principle of double criminality." (D. 16, Ex. D, at 24.) Finally, the government cites, only in part, a statement that in full reads:

> In terms of the offence of concealing, altering, and destroying the evidence of the offense; the fact that the evidence is linked to the evidence within the scope of the offence of protecting the offender, makes the extradition of Eylem Tok necessary for the Turkish judicial authorities *to evaluate her legal status* and to carry out investigation and prosecution about her due to both offences.

(D. 16, Ex. D, at 25 (emphasis added); *see* D. 30, at 15.) This is a statement regarding whether Ms. Tok can be extradited on either charge because the "evidence is linked" to the other. Notably, the statement indicates an intent to "evaluate her legal status"—language the government omits—before any next steps are made. Though prosecution is referenced, it is contingent on that evaluation; the Turkish government has not indicated an intent to prosecute Ms. Tok. Nor has it initiated prosecution in the year that has passed since the underlying incident. In fact, the only intent that the Turkish government has repeatedly stated is an intent to investigate Ms. Tok. (*See* D. 29-1, at 10 (citing underlying documents' repeated statements referring to investigation).)

The Second Circuit analyzed a similar issue of government statements regarding an intent to prosecute in *Sacirbey v. Guccione*, 589 F.3d 52, 68 (2d Cir. 2009). There, as here, the documents submitted by the foreign government, Bosnia, "confirm[ed] only that [the petitioner] is under investigation in Bosnia, not that the Bosnian government seeks to prosecute him." *Id.* The Court specifically assessed a statement that "the Court of Bosnia and Herzegovina will proceed if the request for extradition would be approved," but determined that the petitioner was

only wanted for criminal investigation, not prosecution, because the statement "does not hint at *how* the Bosnian court will proceed—that is, whether by immediate prosecution or by permitting the prosecutor to undertake further investigation" (emphasis in original). *Id*. At best, the Turkish government's statements here evidence a similar ambiguity, and they certainly do not support an interpretation that Türkiye intends to proceed with "immediate prosecution." *Id*. (*See* D. 16, Ex. D, at 25 (Türkiye will "evaluate [Ms. Tok's] legal status" after extradition).) *See also Sacirbey*, 589 F.3d at 68-69 ("[A]n investigation of Sacirbey *in the prosecutor's office*—rather than prosecution in court—is pending in Bosnia. Based on our review of this evidence, we are dubious that Bosnia seeks to prosecute Sacirbey for a crime" (emphasis in original)).

The government makes no response to the fact that the mutual assistance portion of the Treaty is the appropriate mechanism for seeking Ms. Tok's statement except to reiterate its assertion, not rooted in the underlying documents, that Türkiye intends to prosecute Ms. Tok. (D. 30, at 15 (stating only that Ms. Tok's reference to mutual assistance provision is "misplaced").) Yet, at the same time, the government argues that "the Turkish prosecutor should not be penalized for wanting to gather all relevant evidence—including Tok's statement—before initiating formal charges." (*Id*. at 16.) What the government claims the prosecutor should have access to under the extradition chapter for the Treaty—Ms. Tok's statement—is *precisely* the purpose of the mutual assistance portion of the treaty. Treaty, Chapter II, Section I, Article 21 ("mutual assistance shall include…effecting the taking of testimony or statements of a person"). The drafters included this provision on mutual assistance and separated it from the chapter on extradition; Türkiye cannot collapse the mutual assistance portion of the Treaty into grounds for extradition. *E.g.*, *Yoo v. United States*, 43 F.4th 64, 71-72 (2d Cir. 2022) (court interpreting treaty should "avoid readings that render…language surplusage or redundant") (quoting *Sacirbey*, 589

F.3d at 66-70 (2d Cir. 2009)); *Medellin v. Texas*, 552 U.S. 491, 507 (2008) (court may consider "negotiation and drafting history of the treaty" and "postratification understanding"). The government has not identified—and undersigned counsel is not aware of—any Treaty including both extradition and mutual assistance provisions that either adopts a broad reading of the term "charged" or that permits extradition for the taking of a statement by a prosecutor. The plain text of the Treaty is clear that what Türkiye seeks—to evaluate Ms. Tok's legal status and take her statement (D. 16, Ex. C, at 53, 56; D. 16, Ex. D, at 25)—can be effected only under the mutual assistance provision, not through extradition.

The government relies on a purported distinction between the noun and verb definition of the term "charge" and asserts that Ms. Tok ignores the pertinent definition of "charge" as a verb. (D. 30, at 10.) Ms. Tok in fact cited both definitions in her memorandum in support of habeas. "Charge," as a verb, is defined as "To accuse (a person) of an offense." (D. 29-1, at 8, (quoting CHARGE, Black's Law Dictionary (12th ed. 2024).) The definition of charge as a noun expressly requires a "formal accusation." *Id*. This Court should consider the entirety of available definitions of the term "charge" to best assess the term's plain meaning.

To rely exclusively on a single form of the definition, as the government asks this Court to do, requires an interpretation of the term "charged" using the actual part of speech employed by the Treaty: a participle. *See* Treaty, Chapter I, Section I, Articles 1 & 7 (referring to persons who "have been charged" and person who "is charged," the past participle form of "charge"). The participle form inherently relies on the definition of charge as a verb.[2] When interpreting the

---

[2] *See* Merriam-Webster, *Participle definition & meaning*. Merriam-Webster. https://www.merriam-webster.com/dictionary/participle ("a word having the characteristics of both *verb* and adjective") (emphasis added); Dictionary.com, *Participle*, Dictionary.com https://www.dictionary.com/browse/participle ("a form *derived from a verb*, used in English as an adjective…") (emphasis added).

participle form of "charging" in *Vitkus v. Blinken*, the Fourth Circuit interpreted the term read to exclude documents accusing a suspect of an offense from the definition of "charging" documents. *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023). That the treaty in *Vitkus* required a specific charging document does not change the applicability of the Fourth Circuit's interpretation of "charging," a participle, to this Court's reading of the Treaty's use of the term "charged," which is also a participle. *Vitkus*' holding followed from its interpretation of the text of the treaty about the meaning of the participle of "charge." *Vitkus*, 79 F.4th at 362 (treaty interpretation "begins with its text") and 363 (charging document requirement is proof treaty required "to establish that an individual has been 'charged' with a crime"). The Fourth Circuit's conclusion was simple and rooted in the text: accusatory documents are not ones that charge. *Id.* at 361-63. While the government attempts to distinguish the *Vitkus* decision by arguing that the treaty at issue in that case was materially different than that before this Court, it ignores the full text of the Turkish Treaty, which includes both extradition and mutual assistance provisions. (D. 30, at 14-15.)

## 2.    Türkiye Has Not Satisfied the Arrest Warrant Requirement

Contrary to the government's assertion (D. 30, at 16), this Court need not defer blindly to its claim that the documents submitted with the extradition request are arrest warrants, especially where, on their face, they expressly state that Ms. Tok's arrest is still to be evaluated. (D. 16, Ex. C, at 53, 36.) It cannot be the case that any document containing the words "arrest warrant" suffices as a basis for extradition. In considering a petition for a writ of habeas corpus arising out of an extradition proceeding, this Court is not "expected to wield a rubber stamp," but instead has a "duty to ensure that the applicable provisions of the treaty and the governing American statutes are complied with" (alterations omitted). *Skaftouros v. United States*, 667 F.3d 144, 158

(2d Cir. 2011), quoting *Sacirbey*, 589 F.3d at 63 (denying extradition where documents provided did not satisfy treaty's arrest warrant requirement).

In *Basic v. Steck*, 819 F.3d 897, 901 (6th Cir. 2016), the court analyzed both the foreign nation's criminal code and the Black's Law Dictionary definition of an arrest warrant to conclude that the submitted documents "include[d] the elements of an arrest warrant" and therefore satisfied the warrant requirement. Notably, the Sixth Circuit in *Basic* relied on the definition of an arrest warrant external to the foreign government's submission, which defined an arrest warrant as including "a direction that 'a law-enforcement officer…arrest and take a person into custody.'" *Id*. (quoting *Black's Law Dictionary* 1818-19 (10th ed. 2014)). The documents submitted in this case include no such direction: they contemplate only an evaluation of Ms. Tok's arrest after taking her statement and no direction to take her into custody. (D. 16, Ex. C, at 53 ("arrest of the suspect for interrogation will be evaluated" after contacting prosecutor's office upon apprehension), 56 ("After her statement is taken, as it is evaluated whether she will be arrested…").)

Both in *Basic* and in a case on which *Basic* and the government rely, *Matter of Extradition of Nezirovic*, the courts analyzed foreign law and, following that analysis, decided to adopt the explanation of a statement by the foreign nation regarding the role a particular document played in their foreign law. *Basic*, 819 F.3d at 901; *In re Extradition of Nezirovic,* No. CIV.A. 7:12MC39, 2013 WL 5202420, at *14 (W.D. Va. Sept. 16, 2013) ("this court must analyze the law of Bosnia…to ensure that the requirements of the applicable extradition treaty have been satisfied"). In *Basic*, the court relied on a "document, included in the record, from the Ministry of Justice of BiH Sarajevo, explain[ing] that [an earlier] directive to find and arrest [the petitioner]…is the Arrest warrant in this matter" (quotations and alterations omitted). *Basic*, 819

F.3d at 901. Analyzing foreign law to address a tolling issue in *Nezirovic*, the court relied on an affidavit from a Bosnian prosecutor explaining that a particular document "functions to initiate beginning of a criminal prosecution…and is sufficient to toll any statute of limitations." *Nezirovic*, No. CIV.A. 7:12MC39, 2013 WL 5202420, at *14.

There is no such explanation in this matter; the documents are merely titled "arrest warrants" in the English translation.[3] (D. 16, Ex. C, at 53, 56.) The Turkish government does not provide any explanation of its purported arrest warrants to which this Court could defer. This Court cannot ignore the plain text of the documents and their failure to satisfy the definition of an arrest warrant and, therefore, the extradition treaty. *Basic*, 819 F.3d at 901, quoting *Black's Law Dictionary* 1818-19 (10th ed.2014); *Nezirovic*, No. CIV.A. 7:12MC39, 2013 WL 5202420, at *14; Treaty, Article 7 ("a request relating to a person…who has yet to be convicted shall be accompanied by…a warrant of arrest"). The government has no argument in response to the plain text of the purported arrest warrants, which do not direct arrest; it argues only that this Court should defer to Türkiye's unsupported, unexplained labeling of the documents as warrants and that this Court should assume that Türkiye will arrest Ms. Tok, regardless of what appears on the face of the documents. The government also makes no response to the significant difference between documents alleging violations of Article 281 and Article 283. (*See* D. 16, Ex. C, at 53, 56; D. 29-1, at 17-18 (setting out differences and the absence of reference to the Turkish arrest statute in the Article 281 document).)[4]

---

[3] Notably, in the underlying Turkish documents, the Article 281 document has a different title from the Article 283 document.

[4] This Court should take note not only of the differences between the warrants, but also of fact that the decision issuing the Article 281 document refers only to Article 248/5, the seizure to compel provision, and makes no reference to Article 100, the arrest provision. *See* Turkish Criminal Procedure Code, available at https://sherloc.unodc.org/cld/uploads/res/document/tur/ 2005/turkish_criminal_procedure_code_html/2014_Criminal_Procedure_Code.pdf. Like the

Interpreting similar treaty language to the Treaty at issue here, the Second Circuit in *Sacirbey v. Guccione* set out clearly that the requirement for an arrest warrant is necessary to the determination that a person has been charged under the broad definition of charge: "we interpret these provisions [requiring an arrest warrant to extradite a person 'charged with a crime'] to mean that the proof required under the Treaty to establish that an individual has been 'charged' with a crime is a valid arrest warrant." *Sacirbey*, 589 F.3d at 67. That court then reviewed two sets of documents in determining whether the arrest warrant requirement was satisfied. First, as the government concedes (D. 30, at 13), it determined that an arrest warrant issued from a court "ousted of jurisdiction" did not satisfy the requirement because the issuing court was "no longer able to enforce" the warrant. *Sacirbey*, 589 F.3d at 67. Second—and this the government ignores (D. 30, at 12-13, 18)—the court analyzed whether a second set of documents could satisfy the arrest warrant requirement: "official statements indicating Bosnia's intent to prosecute." *Id*. The court concluded that "proof of such intention" also did not satisfy the arrest warrant requirement. *Id*.; *see id.* at 69 ("the Treaty requires a valid arrest warrant…that requirement is not satisfied by a demonstration of intent to prosecute"). Even assuming arguendo that the submissions in this case demonstrate an intent to prosecute Ms. Tok (which they do not—*see supra* Part I.A.1)—that intent does not cure the lack of a valid arrest warrant.

This Court cannot ignore the plain text of the documents purporting to be arrest warrants, which in fact seek only Ms. Tok's statement for further evaluation, include no directive to take

---

courts in *Basic* and *Nezirovic*, this court should read the plain text of Turkish law to ensure that the basic obligations of the treaty are met. The fact that the Article 281 document omits any reference to the formal authority to arrest Ms. Tok only underscores what the text of the document says—there has been no judicial decision to arrest Ms. Tok for an alleged violation of Article 281.

her into custody, and in fact are equivocal on the question of whether she will be detained.[5]

These are not arrest warrants, and Ms. Tok cannot be extradited on their basis. *See Basic*, 819

F.3d at 901; Treaty, Chapter I, Section II, Article 7 (request relating to person yet to be convicted

"shall be accompanied by…a warrant of arrest").

### 3. Ms. Tok's Arrest Violated the Fourth Amendment and 18 U.S.C. § 3184 and Her Prolonged Detention Pursuant to an Unlawful Arrest Violates Her Due Process Rights

Ms. Tok was detained in violation of the Fourth Amendment and 18. U.S.C. § 3184, and

her continued detention violates her Fifth Amendment Due Process rights. The government

originally sought extradition based *only* on the Article 283 allegation, but in Türkiye's original

submission—the submission on which the government relied in seeking an arrest warrant—

Türkiye failed to explain that Ms. Tok was exempt from punishment under Article 283, and

therefore not extraditable under that provision. That omission violated Türkiye's Treaty

obligation to provide "the law prescribing the punishment for the offense, and the law relating to

the limitation of legal proceedings or the enforcement of the penalty for the offense," Treaty,

Chapter I, Section II, Article 7, and therefore failed to comply with 18 U.S.C. § 3184, which

permits arrests for extradition if evidence is deemed "sufficient to sustain the charge *under the*

*provisions of the proper treaty*." 18 U.S.C. § 3184 (emphasis added). As such, Tok's initial arrest

was unlawful because there was not probable cause to conclude she was extraditable under the

---

[5] The fact that the alleged warrants refer to the future possibility of arrest indicates that detention for questioning is different from arrest. Thus, the government's contention that "if Turkish authorities apprehended her for the purpose of interviewing her, she will already have been 'arrested'" is inaccurate. (D. 30, at 18.) Although the government contends that Ms. Tok could challenge the validity of the warrants in Türkiye (D. 30, at 17 n.7), Türkiye effectively uses pre-indictment detention as a punitive measure before a detainee has any chance to challenge charges against them. (D. 29-1, at 7 n.9.) The fact that Türkiye might hold Ms. Tok for an extended period without formal charge—conduct the U.S. State Department has criticized as a form of "summary punishment" (*see* D. 29-1, at 3 n.3)—does not signal an intention to arrest or prosecute her.

provisions of the Treaty.

That Türkiye's submission was *later* amended and that Ms. Tok's detention was *later* reviewed by the Magistrate Judge does not make her original arrest and detention lawful. In *Parretti v. United States*, 122 F.3d 758, 771 (9th Cir. 1997), *withdrawn under the fugitive disentitlement doctrine*, 143 F.3d 508 (9th Cir. 1998), the Ninth Circuit rejected the government's argument that a *later* probable cause determination cured the constitutional violation created by the initial unlawful arrest. That *Parretti* was withdrawn under the fugitive disentitlement doctrine does not affect the court's reasoning in that decision, because the withdrawal had nothing to do with the court's legal analysis.[6] As the Ninth Circuit explained, an unlawful initial arrest is not cured by providing supplemental information or a probable cause hearing.

Moreover, although the government contends that the Magistrate Judge's later probable cause determination cured any unlawfulness in the original arrest (D. 30, at 28), even assuming arguendo that an unlawful arrest could be rendered lawful by after-the-fact government conduct, here, the Magistrate Judge *never* found that the Article 283 charge met the Treaty requirements for extradition. The Magistrate Judge bypassed that issue altogether, relying on the Article 281 charge to conclude that Tok was extraditable. (D. 16, Ex. H, at *19 (bypassing without deciding whether the Article 283 charge meets the Treaty's punishment requirement).) Thus, that later

---

[6] In the context of provisional arrest warrants, several courts have agreed with *Parretti* that extradition detention requires a showing of probable cause. *See, e.g.*, *Caltagirone v. Grant*, 629 F.2d 739, 747 (2d Cir. 1980) (provisional arrest warrant must be supported by probable cause, albeit under a more streamlined and less formal showing than that required at an extradition hearing); *In re Extradition of Russell*, 805 F.2d 1215, 1217 (5th Cir. 1986) (assuming without deciding that provisional arrest warrant had to be supported by probable cause); *cf. Sahagian v. United States*, 864 F.2d 509, 513 n.4 (7th Cir. 1988) (declining to decide whether foreign country must show "full probable cause" for provisional arrest).

judicial determination did not cure the fundamental problem with the initial arrest warrant—that it was issued for an offense that was not on its own extraditable.[7]

The government cannot arrest first and then create a legal basis to justify the arrest after the fact. *See Foucha v. Louisiana,* 504 U.S. 71, 80 (1992) ("[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."). This Court should therefore grant Ms. Tok's petition and order her immediate release.

### 4. Ms. Tok Is Not Punishable by More Than a Year in Prison and Therefore is Not Extraditable

Ms. Tok's detention and extradition are unlawful because neither of the alleged offenses is extraditable as charged. Extraditable offenses under the Treaty are those that are punishable by deprivation of liberty for "at least a period exceeding one year or by a more severe penalty." Treaty, Chapter I, Section I, Article 2(1). Ms. Tok is not subject to such punishment under either provision charged.

The Magistrate Judge certified Ms. Tok's extradition for a violation of the Article 281 charge based *only* on the allegation that Ms. Tok concealed a cellphone. (D. 16, Ex. H, at *40-*45, & nn. 34-35.) As Ms. Tok has noted, she is not subject to punishment on this offense for more than one year, because T.C.'s driver turned the cellphone over to the police, and that conduct reduces the punishment available to 4.8 months to a year. (*See generally* D. 29-1, at 22-24 (describing the statutory scheme of Article 281, the evidence, and case law applying sentencing provisions when considering extraditability).) The government suggests, relying on the Magistrate Judge, that there are disputed facts to be resolved on this point, namely whether T.C.'s driver was acting as Ms. Tok's agent when he turned in the phone. (D. 30, at 18-19 (citing

D 16, Ex. H, at *20-*21).) But that conclusion ignores Türkiye's repeated assertions that T.C.'s driver acted as Ms. Tok's agent. (*See* D. 16, Ex. D, at 20 ("Their drivers are the people, who work under them and carry out their orders and instructions; *there is no difference between something being in the possession of TOK and being in the possession of someone working under her*." (emphasis added)); *id.* ("As a matter of fact, when the incident is evaluated as a whole, TOK acted together with *her subordinates* in general, and the behaviors of *her driver* and assistants made it easier for her to act." (emphasis added)).) Türkiye suggested a triable issue and disputed fact on a different point: still referring to T.C.'s driver as Ms. Tok's *subordinate*, Türkiye pointed to a fact that is disputed and would be at any trial—whether Ms. Tok had possession of the cellphone. (*See id.* at 20; *see also id.* at 19 (acknowledging that surveillance footage shows a different individual taking the cellphone).)

The government's claim that Ms. Tok is punishable for more than a year under Article 281 based on other conduct (D. 30, at 19) ignores the fact that the Magistrate Judge did not find probable cause on any such offenses. (*See* D. 16, Ex. H, at *40-*45, & nn. 34-35.)

Although the Magistrate Judge bypassed the question of whether Ms. Tok can be punished for a violation of Article 283 (D. 16, Ex. H, at *19), the government continues to insist—in defiance of the Treaty, Article 283, and Turkish procedural law—that Ms. Tok is separately extraditable for this offense. (*See* D. 30, at 20.; *see also* D. 30, at 7 (erroneously stating that the Magistrate Judge rejected Ms. Tok's argument that she is not punishable under Article 283).) As T.C.'s mother, Ms. Tok is statutorily exempt from any punishment. (D. 16, Ex. C, at 22 (providing text of Article 283(c)).) The suggestion that she is extraditable because she can be *investigated* or *prosecuted* for this offense is wrong; the Treaty requires that she be

*punishable.* Treaty, Chapter I, Section I, Article 2(1). (*See* D. 30, at 20; *see also* D. 29-1, at 22 n.16 (noting distinction between being prosecutable and punishable).)

The suggestion that Ms. Tok's status as T.C.'s mother is an affirmative defense is contrary to Turkish law and procedure. Turkish law does not treat determination of Ms. Tok's status as T.C.'s mother as an affirmative defense. Ms. Tok does not bear any burden to show the undisputed fact that she is T.C.'s mother; that fact is conclusively established by reference to an authoritative government database, and the relevant extract from that database was included with the extradition request. (*See* D. 16, Ex. C, at 57; *see also* D. 21, Ex. 1, T.C. Vital Record.) Nor does the Turkish government suggest that she bears any such burden or refer to her status as an affirmative defense. (D. 16, Ex. D, at 24 (referring to parent status as "personal exemption" rather than affirmative defense, and not discussing burden to show qualification).) *Cf.* 2 McCormick on Evid. § 346 (8th ed.) ("The term affirmative defense is traditionally used to describe the allocation of a burden, either of production or of persuasion, or both, to the defendant in a criminal case."); *Patterson v. New York*, 432 U.S. 197, 210-11 (1977) (discussing defendant's burden to prove affirmative defenses). Rather, under Turkish criminal procedure, "no need to inflict punishment" is a potential case outcome that is distinct from an acquittal based on an affirmative defense. *See* D. 21, Ex. 2, Art. 223(4)(b) of Turkish Criminal Procedure (where there are grounds for a personal exemption, "a judgment related to 'no need to inflict punishment' shall be rendered"); *cf.* Art. 223(2)(d) of Turkish Criminal Procedure (explaining the process for acquittals based on affirmative defenses).[8]

---

[8] The Turkish government misrepresents this provision of Article 223(4) in its supplemental memorandum, summarizing rather than quoting the statutory language, and in doing so changing the mandatory term "shall" to "may," and adding commentary, not included in the text of the Article, or consistent with its text, that the judge has discretion over these decisions. (*Compare* D. 16, Ex. D, at 24 ("In the paragraph 4 of [Article 223] ... in cases where

Because neither of the alleged offenses meets the Treaty's requirement that Ms. Tok actually be punishable by deprivation of liberty in excess of one year, the certification of extraditability should be vacated and Ms. Tok should be discharged.

### 5. The Article 281 Allegations Do Not Provide a Valid Basis for Extradition

Violation of Article 281 requires a showing that evidence was destroyed, altered or concealed. The cellphone at issue is not evidentiary, as the Turkish government has repeatedly admitted through its statements and its conduct. To conclude otherwise, the government ignores Türkiye's repeated statements equivocating about the cellphone's use as evidence (D. 16-3 at 8; D. 16-4 at 16, 19, 20, 2; *see also* D. 21, Ex. 3, at 11)[9] and an affidavit from a Turkish lawyer who has examined the record evidence in the Turkish case against T.C. and confirms that the cellphone is not present (D. 21, Ex. 4, Affidavit of Atty. Çakmak).  Because the cellphone at issue is not evidentiary, Ms. Tok's conduct would not violate Article 281. (*See generally* D. 29-1, at 32-35.)

Although the certificate of extraditability was *not* based on allegations that Ms. Tok removed T.C. or his friends from the scene of the crash or prevented the government from testing T.C. for alcohol—and the Magistrate Judge specifically declined to reach probable cause on those allegations (D. 16, Ex. H, at *40-*45 & nn. 34-35)—the government continues to press those unsupported allegations (D. 30, at 25-26; *see also* D. 30, at 22[10]). While two minors left the

---

the perpetrator is not sentenced, it is stipulated that a decision of not to impose a penalty *may* be rendered") (emphasis added), *with* D. 21, Ex. 2, Article 223(4) ("In the following cases, a judgment related to 'no need to inflict punishment' *shall* be rendered") (emphasis added).)

[9] The Magistrate Judge accepted this police report as explanatory evidence that could be considered for extradition. (D. 16, Ex. H, at *43 n.35.)

[10] In a another change to the ever-evolving allegations in support of the Article 281 charge, the government is now pressing the groundless assertion that Ms. Tok's actions "concealed evidence of who was driving the car" (D. 30, at 22, 24), a claim that was not

scene before emergency services had arrived, authorities were at the scene *before* Ms. Tok picked up T.C. and two other minors. (D. 16, Ex. C, at 25, 28, 30, 38, 40; Ex. 3, at 18-19.) No minors could have been questioned at the scene pursuant to Turkish law. (D. 21, Ex. 5, Affidavit of Dr. Türay, at 3-5 & n.11.) There is no evidence of any impact on Turkish authorities' ability to obtain witness statements.

Nothing in the original extradition request or police reports suggests that transporting minors from the scene of the accident was of legal concern. All ten minors left the scene before or around the same time as T.C., D.O.O, and A.K. (the three picked up by Ms. Tok). Those minors who were present after the fire brigade arrived—that is, all but Z.H.D. and K.A.—did not indicate that emergency responders sought to speak to them at the scene or keep them there for questioning. (D. 16, Ex. C, 24-26, 37-38; D. 21, Ex. 3, at 11-19.) None were questioned about why they had not spoken to authorities earlier or stayed at the scene. (*See* D. 16, Ex. C, 24-30, 37-38; D. 21, Ex. 3, at 9, 11-19.) Indeed, all minors—and the friends and family members who picked them up—seemed to share the understanding that they were free to leave. It was only after a victim died later in a hospital that the nine minors remaining in Türkiye (those other than T.C.) understood that they were wanted for questioning and duly made themselves available for police questioning. (*See* D. 16, Ex. C, 24-30, 37-38; D. 21, Ex. 3, at 9, 11-19.) The government's assertion that Ms. Tok impaired the availability of witness testimony, and therefore that 18 U.S.C. § 1512(c)(2) could be implicated, is entirely unsupported.[11]

---

advanced by Türkiye or put before the Magistrate Judge and is wholly contradicted by the undisputed fact that T.C. remained at the accident scene with victims, bystanders, and first responders. Needless to say, the Magistrate Judge did not rely on this assertion that was not before him to find probable cause.

[11] The government also continues to make statements about Ms. Tok's alleged conduct that are not supported by the underlying record. This Court should review the original witness statements and police reports, rather than relying on government summaries that misstate the

In addition, the Magistrate Judge did not rely on these allegations in issuing a certificate of extraditability and as such, they are not the basis for Ms. Tok's detention and therefore are not before this Court.

### 6.    The Conduct Alleged To Violate Article 281 Is Distinct From the Conduct Alleged to Violate 18 U.S.C. § 1512(b)(3)

The government does not squarely address Ms. Tok's argument that the Magistrate Judge found probable cause that Ms. Tok violated Article 281 by concealing the cellphone, but found that different conduct (allegedly lying to the security guards) would have violated 18 U.S.C. § 1512(b)(3). (*See* D. 16, Ex. H, at *28 ("Tok lied to and misled the security guards…. She *then* took the cellphone… and concealed it…" (emphasis added).) The government attempts to elide this difference by asserting that lying to the security guards in order to obtain the cellphone *was* concealing the cellphone. (D. 30, at 22 & n.9.) But a person cannot conceal evidence if they have no control over it. If Ms. Tok's crime under United States law were to mislead the security guards so that they would not turn the phone over to police, that crime would have been complete before Ms. Tok allegedly obtained the phone. *See United States v. Santonastaso*, 100 F.4th 62, 72-74 (1st Cir. 2024) (upholding conviction where defendant called witness to encourage him to lie to investigators, but witness did not do so). At the point in time when she spoke to the security guards, Ms. Tok had not concealed anything. Only after Ms. Tok got the phone is she alleged to have concealed it by taking it and leaving it in the car, after which the

---

evidence. (*See also* D. 29-1, at 5 n.6 (pointing out examples of the Turkish government's misstatements.) For example, the government asserts that Ms. Tok and her driver returned to the scene "and the driver turned around and returned to her residence as soon as they saw a police presence." (D. 30, at 5.) The underlying witness statements say no such thing: they state that the driver took Ms. Tok back to the scene, and as they were approaching "the police officers warned us to slow down." The next sentence describes returning home. (D. 16, Ex. C., at 13.) There is no suggestion that anyone turned around because of the police presence or did anything other than "slow down" because of the police presence. But this slanting of the facts creates a misleading impression about Ms. Tok's conduct.

driver returned it to police (apparently intact) a few days later. Because these two actions are conceptually and temporally distinct, they cannot establish that one alleged action by Ms. Tok would have satisfied the dual criminality requirements of the Treaty.

### 7. State Law Cannot Be Used To Establish Dual Criminality Because Article 281 Is Not Listed in the Appendix to the Treaty

Ms. Tok is being held pursuant to the Magistrate Judge's order, which did not determine that it could or would consider state law for establishing dual criminality under the Treaty (D. 16, Ex. H, at *25-*31); for that reason alone, state law is irrelevant at this stage. However, even if this Court did consider the question raised by the government (D. 30, at 24-25), it would have to conclude that the government cannot rely upon state law to support dual criminality for the Article 281 offense. Article 2, Section 1(b) of the Treaty permits consideration of "the laws of… the Requested Party," as opposed to Section 1(a)'s reference to "the federal laws of the United States," only for "[o]ffenses listed in the Appendix to this Treaty." (Treaty, Art. 2, § 1(b).) By its terms, the Treaty requires the Court to look at the offense, that is, the statute under which Ms. Tok is allegedly charged, and compare it to the list of crimes in the Appendix. The drafters of the Treaty could have provided that the court would look to the conduct underlying the offenses, but they did not. *See Aguasvivas v. Pompeo*, 984 F.3d 1047, 1058 (1st Cir. 2021) (interpretation of treaty must rest upon its text).

Article 281 is not an offense listed in the Appendix. Article 281 prohibits, as relevant here, concealing evidence. It does not include any element of misleading witnesses or impeding investigators. In contrast, item #19 of the Appendix applies to "Unlawful obstruction of judicial proceedings or proceedings before governmental bodies or interference with an investigation of a violation of a criminal statute, *by influencing, bribing, impeding, threatening, or injuring by any means any officer of the court, juror, witness, or duly authorized criminal investigator*"

(emphasis added). Even assuming that concealing evidence would necessarily constitute interference with a criminal investigation, which is far from clear, item #19 is very specific. An offense only satisfies the criteria in item #19 if the interference with an investigation is by certain means such as witness intimidation or impeding a particular investigator. Because Article 281 does not require these means, it is not an offense listed in the Appendix. The government's interpretation would read the second half of item #19 out of the Appendix. "In interpreting both statutes and treaties, courts seek to avoid readings that render statutory language surplusage or redundant. But where the language of a treaty is plain, a court must refrain from amending it because to do so would be to make, not construe, a treaty." *Yoo v. United States*, 43 F.4th 64, 71-72 (2d Cir. 2022) (quotation marks and citations omitted). The Treaty distinguishes between "Offenses listed in the Appendix" and other offenses, not between different factual scenarios that might relate to an offense that is not included in the Appendix. In addition, the allegations are that Ms. Tok violated Article 281 by concealing the cell phone, not that she impeded any named and "duly authorized criminal investigator." The core of Türkiye's theory is that Ms. Tok allegedly misled the security guards in order to obtain the phone, which she then concealed; the government's attempt to shoehorn this conduct into item #19 reverses the chronology and misstates the asserted basis for the offense. Because neither the Article 281 offense nor the alleged conduct underlying it meets the terms of item #19, the government cannot rely on state law for dual criminality.

### 8. Even If State Law Is Relevant, the Alleged Conduct Would Not Be a Violation of Mass. Gen. Laws c. 268, §§ 13B or 13E

Although this Court should not consider the applicability of Massachusetts law both because doing so would be unjustified under the Treaty and because it was not addressed by the Magistrate Judge, even if it were to consider the state statutes identified by the government, they

would be unavailing. Massachusetts General Laws Chapter 268, § 13B, is a witness intimidation statute closely analogous to 18 U.S.C. § 1512(b)(3). Ms. Tok's alleged conduct would not violate this statute for similar reasons to its federal counterpart. It is not alleged that Ms. Tok "(1) willfully; (2) misle[]d, intimidate[d], or harass[ed]; (3) a witness or potential witness…" in order to (4) impede or interfere with a criminal investigation. *See Commonwealth v. Nordstrom*, 179 N.E.3d 593, 100 Mass. App. Ct. 493, 499-500 (2021). To the extent that the government asserts Ms. Tok somehow impeded a police investigation, Massachusetts courts require that even false statements must be able to "reasonably… lead investigators to pursue a course of investigation materially different from the course they otherwise would have pursued" in order to qualify as "misleading" under § 13B. *See Commonwealth v. Paquette*, 62 N.E.3d 12, 475 Mass. 793, 801 (2016); *Commonwealth v. Condon*, 162 N.E.3d 76, 99 Mass. App. Ct. 27, 38-40 (2020). The security guards Ms. Tok allegedly misled were not witnesses or potential witnesses in the prosecution of T.C., as they did not observe the accident and never saw T.C.; misleading them did not and could not have impeded or interfered with a criminal investigation. And nothing Ms. Tok allegedly said or did meaningfully impacted the police investigation of the accident; delaying by a matter of hours the taking of witness statements did not lead investigators on anything approaching a "wild goose chase." *See Paquette*, 62 N.E.3d at 18.

The government's suggestion that Ms. Tok "le[]d investigators away from pursuing enhanced charges against T.C. for driving under the influence and from seeking an earlier arrest warrant" (D. 30, at 24-25) is unsupported by any evidence that police would have done anything materially different if D.O.O. and A.K. had remained at the crash site rather than giving statements the next day, or any evidence of alcohol contributing to the crash. Even destroying evidence to prevent police from obtaining it does not violate § 13B. *See Commonwealth v.*

*Tejeda*, 73 N.E.3d 290, 476 Mass. 817, 820-21 (2017). Moving T.C. and thereby rendering an alcohol test unavailable would not violate this statute as construed by the Supreme Judicial Court in *Tejeda*, where the defendant's action of rendering a bag of supposed heroin unavailable for testing by swallowing it was found insufficient to support a charge under § 13B. *See id.* Similarly, temporarily delaying when the police were able to access the cell phone would not violate the statute as interpreted in *Tejeda*.

Meanwhile, General Laws Chapter 268, § 13E, punishes one who "alters, destroys, mutilates, or conceals *a record, document, or other object*… with the intent to impair the record, document or object's integrity or availability for use in an official proceeding." (emphasis added). Like 18 U.S.C. § 1512(c), this statute applies only to documents or objects, and not to people. Moving T.C. and the other children therefore could not violate § 13E. There is no allegation that Ms. Tok altered the contents of the cellphone or had any means to access the contents of a stranger's iPhone, and the cellphone was made available to police. *Contrast Commonwealth v. Martinez*, 158 N.E.3d 63, 98 Mass. App. Ct. 545, 546 (2020) (defendant asked coworker to throw evidence in the river). For much the same reasons as the federal cognate, Ms. Tok's alleged conduct would not violate Mass. Gen. Laws c. 268, § 13E.

## II.    CONCLUSION

For the foregoing reasons, Ms. Tok respectfully requests that the Court issue an order granting her Petition, revoking the Certification and Committal for Extradition, and directing the immediate and permanent discharge of the conditions of release imposed on her in connection with the extradition case, and such other and further relief as the Court deems just and equitable.

Respectfully submitted,
EYLEM TOK,
By her attorneys,

/s/ David A. Russcol
Emma Quinn-Judge (Mass. Bar #664798)
David A. Russcol (Mass. Bar #670768)
Zalkind Duncan & Bernstein LLP
2 Oliver St., Suite 200
Boston, MA 02109
(617) 742-6020
equinn-judge@zalkindlaw.com
drusscol@zalkindlaw.com

Dated: October 10, 2025

## CERTIFICATE OF SERVICE

I, David A. Russcol, hereby certify that this document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ David A. Russcol
David A. Russcol